STATE, Respondent, *v.* LAUGHLIN, Appellant.

(No. 7,724.)

(Submitted November 9, 1937.  Decided November 20, 1937.)

[73 Pac. (2d) 718.]

*Mr. P. E. Geagan* and *Mr. John B. McClernan*, for Appellant, submitted a brief; *Mr. McClernan* argued the cause orally.

*Mr. Harrison J. Freebourn*, Attorney General, and *Mr. Mark H. Derr*, Assistant Attorney General, for the State, submitted a brief; *Mr. Derr* argued the cause orally.

MR. JUSTICE MORRIS delivered the opinion of the court.

The defendant was convicted of the crime of assault in the second degree, and sentenced to imprisonment for five years. The assault was committed upon the person of James Pringle, a justice of the peace in Deer Lodge county. This appeal is from the judgment and from an order denying defendant's motion for a new trial.

Three specifications of error are assigned: (1) On the court's instruction numbered 6½, as to what constitutes "grievous bodily harm"; (2) on the court's refusal to strike the affidavit

of M. P. Mahoney; and (3) on the court's denial of defendant's motion for a new trial.

Pringle was 72 years old at the time of the assault; the defendant 28. About a year prior to the assault, the defendant's wages were garnished in an action brought in Pringle's court. There is nothing to show that defendant entertained any ill will towards Pringle at the time of the court action, but more than a year afterwards, and on the evening just prior to the evening on which the assault occurred, the defendant approached Pringle as the latter was near the entrance to the Peckham building, where he roomed, in the city of Anaconda. Defendant on approaching asked Pringle for fifty cents and, on being informed that Pringle had no money, the defendant began to talk about the garnishment of his wages that had been made more than a year before.

It appears that Pringle did not at first know just what the defendant had in mind or what his purpose was in accosting him, but defendant in the course of his talk about the garnishment said he was going to get a gun and kill Pringle for it. Pringle testified that the defendant "pinned" him by his coat and forced him into the entrance of the building. About that time a man by the name of McCullom drove up to the sidewalk, got out of his car, and engaged the defendant in conversation, and defendant let go of Pringle and the latter proceeded upstairs to his room. This occurred on Saturday, of the 3d of October. On Sunday, the following day, Pringle was in the country all day, and on returning to the city, and while on his way to a restaurant just before 7 o'clock P. M., stopped in at the "Condor" for a glass of beer; while drinking his beer at the bar, and upon glancing into the mirror back of the bar, he recognized the defendant, who, with two other persons, was having beer at another place along the bar. After the three had finished their beer, the two other persons left the place and defendant came over to Pringle and again began to talk of the garnishment. Pringle tried to mollify the defendant by advising him that he had no personal interest in actions brought in his court; but defendant continued his abusive complaint.

Pringle asked the bartender to call an officer to take the defendant away, but there was no telephone in the place and the bartender said to Pringle that the defendant was just bluffing.

After drinking his beer, Pringle started to leave the place, and defendant joined him. Pringle testified he began to wonder what defendant meant to do, and stopped at the cigar case just inside the door. While standing there, two other persons came in and spoke to the defendant, and defendant joined them and went back towards the bar. In a short time Pringle started to leave the place, and then heard someone running just behind him, and immediately thereafter the defendant "reached around" and jerked Pringle's glasses off, threw them down, and pushed Pringle through the door. The testimony is in some conflict as to whether, upon reaching the sidewalk, Pringle was knocked down or whether the defendant fell down and dragged Pringle with him, but the evidence is uncontradicted that, after they were down, the defendant beat Pringle with his fist about the head and face and, during the struggle and while holding Pringle down, caught him by the shoulders and pounded his head up and down on the cement sidewalk at least twice. There is no testimony by anyone that Pringle made any resistance or attempted to strike the defendant. The struggle, according to the various witnesses, lasted from a few seconds to five or ten minutes. It is quite clear it lasted long enough for one of the witnesses to walk approximately half a block. The witness Page interfered, saying to the defendant, "What are you trying to do? Kill this old man?" and thereupon the defendant released Pringle, got up, and went across the street, narrowly missing being run down by a passing car. Page assisted Pringle to his feet and to his room; called Dr. J. L. O'Rourke, who upon examination directed that Pringle be taken to the hospital. Dr. O'Rourke testified that when he first saw Pringle he was "bleeding profusely from the head and face. His face was greatly swollen, and there were numerous lacerations and abrasions over practically his entire face. Both eyes were swollen shut and he was bleeding quite profusely from the

494

mouth. \* \* \* He seemed to be quite dazed and was unable to relate just what had happened.'' He further testified, in substance, that an X-ray showed that Pringle had a double compound fracture of the lower jaw, a fracture on either side, one cartilage of the nose dislocated, an injury to the scalp showing a collection of blood under the skin, discolorations of the chest wall, and there was evidence of concussion. The cartilage of the nose was torn loose from the bony structure, and Pringle's face was one-third larger than at the time of the trial as a result of the swelling. He was in the hospital eight days, and confined to his room thereafter for four or five weeks. The nose laceration had not become normal at the time of the trial.

Practically no evidence was adduced on behalf of the defendant. He, taking the witness-stand in his own behalf, testified that he was intoxicated both on October 3 and 4, and had no recollection of seeing or talking with Pringle on either of the days mentioned, nor remembered about the assault. Other witnesses for the defense testified defendant was drunk at the time of the assault. Witnesses for the state, including Judge Pringle, testified that there was evidence of intoxication, but the defendant was not drunk. Intoxication cannot be used to shield one from answering for a criminal offense any further than it may be shown in mitigation, and that such intoxication had reached the stage where the accused was incapable of forming a malicious intent. (Sec. 10728, Rev. Codes; *State* v. *Stevens*, 104 Mont. 189, 65 Pac. (2d) 612.) The evidence here clearly shows that the defendant was in no such state of intoxication. His seeing Pringle on the fourth and at once bringing up the same subject he had talked about the day before, and again abusing the judge, clearly demonstrates his capacity to harbor malice.

The court's instruction numbered 6½, on which defendant's first assignment of error is based, is as follows: ''Grievous Bodily Harm. You are instructed that grievous bodily harm would include any hurt or injury calculated to interfere with health or comfort of the person injured; it need not be

necessarily an injury of a permanent character. By grievous is meant atrocious, aggravated, harmful, painful, hard to bear, serious in nature.''

The statute defines assault in the second degree, by subdivision 3 and in part by subdivision 5 of section 10977, Revised Codes, as:

''Every person who, under circumstances not amounting to the offense specified in the last section: * * *

''3. Wilfully or wrongfully wounds or inflicts grievous bodily harm upon another, either with or without a weapon; or, * * *

''5. Assaults another with intent to commit a felony.''

Counsel contend, in substance, that this instruction is so elastic that it might encompass a boxed ear at one extreme, or a cut throat at the other. We see little to criticize in the instruction as a whole. ''Grievous bodily harm'' has been frequently defined in numerous decisions, and its meaning in assault actions is fairly well settled. Defendant contends that if the term as defined in *State* v. *Sloan,* 22 Mont. 293, 304, 56 Pac. 364, be sound, then the court's instruction here is clearly prejudicial to the defendant. To this we do not agree. The term was used in the *Sloan Case* for the purpose of formulating and laying down the rule as to what degree of apprehension of death or great bodily harm one assaulted may have before committing justifiable homicide. The term is not there defined, but merely used in the way of illustration.

Wharton on Homicide, third edition, page 376, says: ''Great bodily injury defines itself, and means great bodily injury as distinguished from slight or moderate bodily injury.'' In *State* v. *Doherty,* 52 Or. 591, 98 Pac. 152, 154, the supreme court of Oregon said that: ''By great bodily harm is meant more than a mere injury by the fist, such as is likely to occur in ordinary assault and battery.'' This definition was given in a case involving homicide, and we find many definitions in the books of a similar nature in defining the term; but it was further said in the *Doherty Case:* ''If the intention of the assailant is

only to commit a trespass or simple beating, it will not justify his killing. \* \* \* But, considering the relative age and strength of the parties or the ferocity of the attack, if the intended beating is of such a character as to endanger life or limb, then it will be felonious.''

The definitions, as a rule, are given in cases where the defendant was on trial for assault alleged to have been made in self-defense, or to repel an attack, and such cases can be made applicable here only as they lay down general principles. The assault here was entirely on the side of defendant. We think the instruction fairly and justly describes the assault with which defendant is charged. A mere trespass upon the person of another or a simple beating would clearly come under assault in the third degree. The defendant's crime exceeded such an assault in its ferocity, its maliciousness, and in the injuries suffered by the victim.

The court in its instructions gave to the jury the definitions of assault in the first, second, and third degrees, as set out in sections 10976, 10977, and 10978, respectively, and the jury heard all the evidence which, in our opinion, establishes assault of a more grievous degree than the third degree defined by the statute. The charge, as a whole, clearly and fully submitted the issues of fact to the jury, and was just and fair to the defendant. No reasonable person will contend that, considering the great disparagement in the ages of the defendant and his victim, the maliciousness of the unprovoked attack and the seriousness of the aged judge's injuries, third degree assault provides adequate punishment. Furthermore, ''when the whole record is sufficient to establish the guilt of the defendant, even though there was error, a new trial will not be granted unless it clearly appears that the error complained of actually prejudiced the defendant in his right to a fair trial.'' (*State* v. *Dixson,* 80 Mont. 181, 260 Pac. 138, 150, citing secs. 11853 and 12125, Rev. Codes.) No doubt exists in our minds that the jury's verdict finding the defendant guilty of assault in the second degree is clearly and fully sustained by the evidence.

The second assignment of error is on the court's denying defendant's motion to strike the affidavit of Mahoney. **[6]** Mahoney was the night chief of police of the city of Anaconda. The affidavits of four persons had been filed in support of the motion for a new trial, all affirming under oath that W. F. Emerson, one of the jurors, did in their presence, while all were drinking at a certain saloon in Anaconda and while the trial was in progress, discuss the trial of the defendant, and expressed strong prejudice against him, and that he had made up his mind that the defendant was guilty. Emerson made an affidavit of denial of the charges in toto, and Mahoney made an affidavit that each and all of the four who gave the affidavits for the defense were companions and associates of the defendant, that each and all were men of bad repute, had all been arrested in the county for drunkenness, and each and everyone was "absolutely unworthy of belief," and their reputation for honesty and integrity was bad. This affidavit was made subsequent to, and had no bearing upon, the trial, and cannot be considered in our review of the proceedings had at the trial, unless it was sufficient to clearly establish disqualification of the juror. In so far as it bears upon the motion for a new trial, this court said in *Pascoe* v. *Nelson,* 52 Mont. 405, 158 Pac. 317, 318, where the court had under consideration a motion for a new trial: "Counter affidavits were presented which put in issue all the material allegations concerning the statements made by counsel, except the reference to the indemnity insurance. It was the province of the trial court to determine the facts from the conflicting affidavits. (*Beller* v. *Le Boeuf,* 50 Mont. 192, 145 Pac. 945; *Middlefork Cattle Co.* v. *Todd,* 49 Mont. 259, 141 Pac. 641.)" In the cases cited, it was held that the determination of the questions raised by the conflicting affidavits was within the province of the trial court, and we think that rule applies here. If, in denying the motion, there was no abuse of the discretion vested in the trial court, no right of review arises here. Acting within its discretionary powers, the trial court was free to give to the affidavits submitted by both the

state and the defendant, such consideration as in its judgment they were entitled to.

Defendant's third assignment of error is on the court's denial of the motion for a new trial, and is predicated on the grounds set forth in the notice of motion for such trial, five in number, but only number one is argued in the brief, which is: "Misconduct of the jury by which a fair and due consideration of the case was prevented."

The entire argument devoted to this phase of the assignment is directed to citations in support of the affidavits of the four persons whom the Mahoney affidavit branded as unworthy of belief. This court said in *State* v. *Jones*, 32 Mont. 442, 80 Pac. 1095, 1099: "As has been repeatedly held by this court, a motion for a new trial is addressed to the sound legal discretion of the trial court; and the action of the latter will not be disturbed except in an instance manifesting a clear and unmistakable abuse of such discretion." The rule was followed again in *State* v. *Prlja*, 57 Mont. 461, 189 Pac. 64. The rule applies to all proceedings relative to a motion for new trial, and an order in that behalf is subject to review on appeal only when it is clearly shown that there has been an abuse of discretion. This court said, in *State* v. *Mott*, 29 Mont. 292, 308, 74 Pac. 728, 733: "In passing on a motion for a new trial based upon the alleged incompetency of a juror, the lower court is called upon to exercise a sound legal discretion. In the absence of a clear showing of error in this regard, the appellate court will not interfere." The discretion of the trial court was necessarily involved in both the motion to strike the Mahoney affidavit and in passing upon the motion for the new trial as a whole, and we find no abuse of discretion in the record.

The judgment and order denying a new trial are affirmed.

Mr. Chief Justice Sands and Associate Justices Stewart, Anderson and Angstman concur.