## Commonwealth *v.* Dorazio, Appellant.

Argued May 22, 1950. Before DREW, C. J., STERN, STEARNE, JONES and BELL, JJ.

*Francis T. Anderson,* with him *Gray, Anderson, Schaffer & Rome,* for appellant.

*John F. Kane,* Assistant District Attorney, with him *John H. Maurer,* District Attorney, for appellee.

OPINION BY MR. JUSTICE ALLEN M. STEARNE, June 26, 1950:

The appellant, Gustav Dorazio, appeals from the judgment and sentence entered against him on a verdict of guilty of murder in the second degree.

On Friday, January 7, 1949, the appellant and Albert Blomeyer, the deceased, were both employes of C. Schmidt & Sons Brewing Company of Philadelphia, employed in different departments. They were members of rival unions, each of which sought to represent the brewery workers. The deceased and two other employes had for some time been circulating a petition seeking an election supervised by the National Labor Relations Board to determine union representation.

At about 9:30 A.M. on the day of the killing the defendant complained to the vice-president of the company that a petition was being circulated by a man named Hornung, that if Hornung were not stopped he (defendant) "was going to let [him] have it." At about 10 A.M. the defendant approached Hornung and threatened him "to lay off taking up this petition, to stop taking it around, and if [he] didn't [defendant] was going

to send [him] home in an ambulance." Defendant also spoke to another employe, Keehfus, at about 10 A.M., saying, "I just told Hornung I am going to send him to the hospital. You better watch out, I am going to send you home in an undertaker's wagon."

From the Commonwealth's evidence the jury could have found the following facts: shortly after 3 P.M. the victim and several other men went to the Sternewirt, a brewery tap room, where beer is gratuitously served to employes and guests of the brewery. The victim had several beers. He also was securing signatures to a union petition. Morton L. Smith, the business agent for the union to which defendant belonged, was also in the Sternewirt at this time. At about 4 P.M. the victim left the plant in the company of two men, Witt and Amberg, employed in the same department (the fermenting room of the brewhouse) and he was walking between them. As the victim and his companions were walking on a street adjacent to the brewery the defendant was standing alone behind a pillar near the brewery plant. The defendant came from behind the pillar and followed behind the three men. He overtook them and "started swinging" at the victim and struck him. The victim turned, apparently recognized the defendant, and said, "It's Gus Dorazio." In turn the victim started to run down Edward Street back towards the brewery. The defendant followed in close pursuit. As the victim ran up the street he passed Smith, the rival union's agent, who put his hand out, whether or not to stop the victim is not clear. The victim ran into a brewery building known as the brew house; he ran up a flight of steps and passed through a door into a corridor. The Commonwealth's witness stated that neither Blomeyer nor defendant fell as they went up the steps and passed through the door immediately fronting on these steps. Immediately thereafter eye-witnesses observed the victim on the floor of the corridor either "in a crouched

position" or lying on his left side; *the defendant was standing over Blomeyer punching him repeatedly in and about the head and body.* Witt, one of the men who had been walking with the deceased had followed the flight and sought to pull defendant away from the victim. The defendant beat Witt, knocked him down several times and struck him until and after he said he had enough. The assistant brew master ran up to stop the defendant and the defendant struck him in the stomach and knocked him across the corridor, down on one knee, momentarily helpless and breathless. Two witnesses testified that defendant struck the victim, while he lay prostrate, at least ten to fifteen times. After this incident the defendant ran or was pursued a short distance by an increasing crowd of brewery employes to a delicatessen store on Second Street, where he was apprehended and taken into custody by the police.

The victim washed, was taken to a neighborhood hospital and was discharged after a brief course of treatment. The victim became ill a short time later that day, passed into semi-conscious state, was removed from his home to a hospital where he died about 9 P.M. that evening.

The coroner's physician testified that death was "a result of hemorrhage with pressure against the brain resulting from a fracture of the skull"; that there was "a widespread comminuted fracture throughout the right temporal and parietal bones" with massive epidural hemorrhage pressing in and distorting the right anterior lateral surface of the brain. Under cross-examination the doctor testified that there were various lines of fracture as though the head either hit or was hit by a hard object. He stated "it is seldom that a fist—a blow of a fist can cause a comminuted fracture like that, but I would not exclude that possibility." The doctor after looking at the defendant's hands testified he could have caused the injuries; he further stated that he did not

believe that the kind of fracture deceased sustained could result from tripping and striking his head on a door, *that it was a smash fracture.* The doctor stated that it was his opinion that the injuries were the result of *one powerful blow.*

The defendant's version of this occurrence was that unnamed persons had been threatening him and calling him names; that on the night before the incident he received an anonymous threatening phone call. The defendant denied having made threats against anyone. He testified that he knew the three men were connected with the C. I. O. because he had seen them around the plant; that he had stopped the three men to ask them about the phone call; that he merely touched the victim on the shoulder to start a conversation and the victim punched him and ran. He stated that he did chase the victim into the corridor but what took place there was a general fight in which he was only defending himself. The defendant contends that the victim's head injury resulted not from any alleged beating but from a fall either at the top of the steps or in the corridor. Defendant testified, "As he was starting to go up the steps, he was stumbling up the steps, climbing up the steps and he squashed his head in the door, and as he squashed his head against one door, the other door opened." After the fall, defendant said he was picking the victim up when the victim and Witt started to punch him and he fought back.

The defendant had been a professional heavyweight prize fighter for about 8 years prior to 1944; he fought a "great many" times and had been a contender for the heavyweight championship of the world in 1941, being defeated by the then champion, Joe Louis. Defendant was about five feet nine inches tall and weighed about 190 pounds.

In reviewing a record of conviction for murder under the Act of February 15, 1870, P. L. 15, section 1, 19 PS

1186, it is our duty to determine whether the degree or elements of murder in the specified degree are present; whether there is sufficient evidence from which the jury could find beyond a reasonable doubt that the degree of murder was committed by the accused: *Commonwealth v. Karmendi*, 328 Pa. 321, 323-4, 195 A. 62. In the determination of such question we ordinarily confine ourselves to the commonwealth's evidence: *Commonwealth v. Karmendi,* supra; however, where the complaint is directed to the judge's charge we must assume the facts in their most beneficial aspect to the accused and determine how the charge may have governed those findings of fact by the jury.

The appellant contends that since he had no weapon of any kind in his possession the essential element of intent to kill or to do great bodily harm cannot be inferred "from the making of a mere assault, without a battery," with bare fists. Defendant concedes that under the Commonwealth's evidence the conviction may be sustained. But he complains that the trial judge erred in charging the jury that even if they believed that defendant struck no blows and that the deceased sustained a skull fracture in a fall, nevertheless, they could find defendant guilty if he was an unprovoked aggressor and caused the decedent to flee, fall and injure himself.

The portion of the charge of the trial judge and the colloquy which took place in the presence of the jury, of which appellant complains, is as follows: "Let me tell you something else about this fractured skull. It does not make any difference in this case as to the defendant's guilt or innocence whether Blomeyer's skull was fractured by his head hitting the door or was fractured by the blows of this defendant—that is, if that fracture occurred when Blomeyer was running away from an attack by Dorazio, if he had sought to escape Dorazio and was running away and while running away he stumbled and fell on those steps and fractured his

skull, this defendant is responsible for it. Let us assume that the defendant started the attack, as the Commonwealth contends. Where a man starts a wilful and wanton attack upon another and that person seeks to escape by running away and in the haste to get away he stumbles and falls and hits his head on a concrete curb, the man who is threatening him and pursuing him is responsible for the consequences of that fall. When a chain of circumstances is put into action by a defendant, he is responsible for the reasonable and probable consequences of that chain of circumstances. Therefore, it is not important whether Blomeyer's skull was fractured by a fall against the door or by the application of the fists of this defendant. . . .

"I think it is my duty to say to you what I have said, beyond any cavil, that if you believe from the evidence of the Commonwealth beyond a reasonable doubt that the defendant committed an unlawful and malicious attack upon Blomeyer without a specific intent to take life and that as a result of that attack Blomeyer died, you can convict him of second degree murder."

"Mr. Gray: . . . your Honor told the jury, and I ask for an exception to it, if they believe his head struck the door, causing the fracture and his death, this defendant under the evidence is just as liable as if he struck a blow. THE COURT: I, of course, prefaced that by saying if they believe the defendant started a wanton attack upon Blomeyer and he ran to avoid the attack, and in running he stumbled and fell and fractured his skull, that the defendant pursued him, the defendant is as responsible for it as if he had struck a blow."

The defendant has apparently lumped together two propositions which must be separated before they can be properly considered. The first is that there is lacking evidence of malice, a requisite element in second degree murder. The second apparently relates to causal connection between the defendant's initial assault and

death, if it resulted from a fall. The second proposition may be dismissed. It is clear that the decedent's death was a proximate consequence of the defendant's unlawful act. See generally: *U. S. v. Warner*, 28 Fed. Cas. 16,643; *Thornton v. State*, 107 Ga. 683, 33 S. E. 673; *The People v. Frank Adams*, 52 Mich. 24, 17 N. W. 226; *Cox v. People*, 80 N. Y. 500; *The Queen v. Martin*, (1881) 8 Q. B. D. 54; *Reg. v. Halliday*, (1889) 54 J. P. 312, 61 L. T. R. 701; *Reg. v. Pitts*, (1842) 1 Car. & M. 284, 174 Eng. Rep. 509; *Rex v. Evans*, (1812) 1 Russ. C. & M. 425; *Rex v. Hickman*, (1831) 5 Car. & P. 151, 172 Eng. Rep. 917; *Rex v. James Curley*, (1909), 2 Cr. App. R. 109; *Reg. v. Towers*, (1874), 12 Cox, C. C. 530; *Rex v. Frederick Coleman*, (1920) 84 J. P. 112; Cf. *Hendrickson v. Com.*, 85 Ky. 281, 3 S. W. 166; 1 *Warren on Homicide* (Perm. Ed.) Section 56; *Beale, The Proximate Consequences of an Act*, (1920), 33 Harv. L. R. 633; *Levitt, Cause, Legal Cause and Proximate Cause*, (1922), 21 Mich. L. R. 34, 160; *Edgerton, Legal Cause*, (1924), 72 U. of Pa. L. R. 211; *Proximate Cause, McLaughlin* (1925), 39 Harv. L. R. 149. The defendant's brief concedes causation by stating, "The defendant may not escape from suffering the consequences of his unlawful act. He wrongfully started a series of events which unexpectedly resulted in death as a proximate result. He is therefore guilty of culpable homicide, but his crime is involuntary manslaughter, and not murder." Whether the homicide was murder or manslaughter depends on the presence or absence of malice.

We agree with appellant that in disposing of his objection we must assume that no blow was actually landed before the flight and fall. In the exchange between counsel and the court it was stated that defendant was "as responsible for it *as if he had struck a blow*," covering that possible finding also.

Murder in this commonwealth, though divided by statute into degrees, is still determined by the common

law. Murder in the first degree requires a specific intent to kill and deliberation or premeditation; all other homicide punishable as murder at the common law is murder in the second degree. The division of murder into degrees was for the purpose of fixing punishment in relation to the heinousness of the offense, not to change the common law principles. The distinguishing criterion between murder and other homicide is malice: *Commonwealth .v. Malone*, 354 Pa. 180, 183, 47 A. 2d 445; 4 Bl. Comm. 198. See *Perkins, A Re-Examination of Malice Aforethought* (1934), 43 Yale L. J. 537; and note (1924) 33 Yale L. J. 528.

The appellant argues that the malice necessary to support a conviction for murder cannot be imported from the use of the fists in the circumstances of this case; that such malice could only be shown by evidence that there was an intent to inflict great bodily harm.

Ordinarily where an assault is made with bare fists only, without a deadly weapon, and death results there would only be manslaughter: *McAndrews v. People*, 71 Colo. 542, 208 Pac. 486, 24 A. L. R. 655; *People v. Crenshaw*, 298 Ill. 412, 131 N. E. 576, 15 A. L. R. 671; cf. 25 J. Cr. L. 775. This follows naturally from the requirement that there appear an intent to inflict great bodily harm. In *Wellar v. People*, 30 Mich. 16, this principle was well stated as follows: "It is not necessary in all cases that one held for murder must have intended to take the life of the person he slays by his wrongful act. It is not always necessary that he must have intended a personal injury to such person. But it is necessary that the intent with which he acted shall be equivalent in legal character to a criminal purpose aimed against life. Generally the intent must have been to commit either a specific felony, or at least an act involving all the wickedness of a felony. And if the intent be directly to produce a bodily injury, it must be such an injury as may be expected to involve serious consequences, either peril-

ing life or leading to great bodily harm. There is no rule recognized as authority which will allow a conviction of murder where a fatal result was not intended, unless the injury intended was one of a very serious character which might naturally and commonly involve loss of life or grievous mischief. Every assault involves bodily harm. But any doctrine which would hold every assailant as a murderer where death follows his act, would be barbarous and unreasonable. . . . In general, it has been held that where the assault is not committed with a deadly weapon, the intent must be clearly felonious, or the death will subject only to the charge of manslaughter. The presumption arising from the character of the instrument of violence, is not conclusive in either way, but where such weapons are used as do not usually kill, the deadly intent ought to be left in no doubt. There are cases on record where death by beating and kicking has been held to warrant a verdict of murder, the murderous intent being found. But where there was no such intent the ruling has been otherwise. . . . The willful use of a deadly weapon, without excuse or provocation, in such a manner as to imperil life, is almost universally recognized as showing a felonious intent. See 2 Bish. Cr. L. §§680, 681. But where the weapon or implement used is not one likely to kill or to maim, the killing is held to be manslaughter, unless there is an actual intent which shows a felonious purpose."

Whether the malice necessary to constitute murder may be implied from the use of fists alone must depend on the particular circumstances. See *Re Carlson*, 127 Pa. 330, 18 A. 8; *Smith v. Com.*, 100 Pa. 324. The size of the assailant, the manner in which the fists are used, the ferocity of the attack and its duration and the provocation are all relevant to the question of malice. See *Com. v. Blakeley*, 274 Pa. 100, 105, 117 A. 685; *Com. v. Guida*, 298 Pa. 370, 148 A. 501; *Com. v. Lisowski*, 274 Pa. 222, 117 A. 794. See *State v. Smith*,

197 Wash. 363, 83 P. 2d 749, 754, holding that the fists though not ordinarily a deadly weapon may become deadly by repeated and continued blows applied to vital and delicate parts of the body of a defenseless, unresisting victim. The appellant refers to an illustrative footnote in *Commonwealth v. Malone,* 354 Pa. 180, 186, 47 A. 2d 445, footnote 3, as requiring an intent to inflict "enormous" bodily harm to satisfy the requirement of malice in second degree murder. That illustration does not establish a minimum test of what is required to constitute "serious bodily harm." It is unnecessary to now detail what constitutes such harm. We agree, however, that it is not necessary that the injury be intended to be permanent or dangerous to life, it is malicious to intend injury such as to seriously interfere with health and comfort: *Reg. v. Ashman,* (1858) 1 Fost. & F. 88, 175 Eng. Rep. 638; *State v. Laughlin,* 105 Mont. 490, 73 P. 2d 718, 720; *State v. Bowers,* 178 Minn. 589, 228 N. W. 164.

The error in appellant's argument is implicit in his suggestion that, assuming no blow were struck, and the attack were interrupted as soon as the deceased started to run, it would be obvious that there could be no conviction for an attempt to kill or for an attempt to commit aggravated assault and battery. This is, of course, correct but it overlooks the fact that we have before us a total pattern reflecting on the existence or non-existence of defendant's malice. The error in appellant's argument is in assuming that only the events up to the point of the alleged fall may be considered in determining the character of defendant's act. The events immediately following the pursuit are evidence of the intent and state of mind of the defendant when the pursuit began. These events show a brutal, persistent attack upon a helpless, non-resisting victim; they show a measure of depravity and hardness of heart, a recklessness of consequences and a mind regardless of social

duty which imports malice: *Com. v. Drum*, 58 Pa. 9; *Com. v. Malone*, 354 Pa. 180, 183-4, 47 A. 2d 445. It was from this malice that the deceased fled; appellant's point is that the commonwealth could not have proved the malice if the assault were not consummated.

The learned trial judge defined malice. He instructed the jury upon condition that it find "an unlawful and *malicious* attack upon Blomeyer." (Emphasis supplied.) The lengthy portion of the charge, just quoted above, was followed by the sentence, "The important question is, who started the fight and who was the pursuer and continued to fight and under what circumstances was the pursuit conducted and the continuation of the fight conducted." The trial judge was clearly charging on the basis of the Commonwealth's evidence in relation to the single fact that the fatal injury resulted from a fall. There is no basis for defendant to read into this portion of the charge the other facts which defendant offered. The jury could properly infer that defendant's malice was a continuing factor from the moment the onslaught began. Bearing in mind that the purpose of the manslaughter and murder distinction is for the purpose of determining the heinous character of the offense and to determine appropriate punishment it would defeat the object of the rule were we to suppose that the character of an attack depends solely on the chronological order in which the nature of the attack manifests itself.

The defendant indulged himself in an unjustified, unprovoked, brutal and persistent attack upon the deceased. He received a fair trial and the judge properly instructed the jury on the evidence.

The judgment is affirmed and the record is remitted to the court below so that the sentence imposed may be carried out.