J-A24034-23

2024 PA Super 146

COMMONWEALTH OF PENNSYLVANIA   :   IN THE SUPERIOR COURT OF
  :   PENNSYLVANIA
          Appellant   :
  :
  :
  :
          v.   :
  :
  :
  :
KENNETH FRYE   :   No. 140 EDA 2023

Appeal from the Order Entered December 21, 2022
In the Court of Common Pleas of Philadelphia County
Criminal Division at No(s): CP-51-CR-0005402-2022

BEFORE: STABILE, J., DUBOW, J., and SULLIVAN, J.

OPINION BY SULLIVAN, J.:                  **FILED JULY 15, 2024**

The Commonwealth appeals from the order granting the motion of

Kenneth Frye ("Frye") to "quash the return of transcript"[1] and dismiss the

third-degree murder[2] charge against him. After careful review, we reverse

and remand for further proceedings.

The trial court provided the factual and procedural history of this case,

which we set forth in relevant part, as follows:

On April 15, 2022, Eric Pope ("[the Victim]") died outside of
the Tabu Lounge and Sports bar . . . in Philadelphia. He was 41

-------------------------------------------------------

[1] A pre-trial motion for writ of *habeas corpus* challenging the sufficiency of the
evidence presented by the Commonwealth at a preliminary hearing is
generally referred to in Philadelphia County as a "motion to quash the return
of transcript." ***See***, ***e.g.***, ***Commonwealth v. Ouch***, 199 A.3d 918, 922 n.2
(Pa. Super. 2018). The Commonwealth certified the trial court's order
substantially handicaps its prosecution; therefore, we have jurisdiction over
this appeal. ***See id***. at 922 n.3 (applying Pa.R.A.P. 311(d) in these
circumstances).

[2] ***See*** 18 Pa.C.S.A. § 2502(c).

years old and weighed 161 pounds. The stipulated medical examiner's report indicated that the immediate cause [of] death was from complications due to blunt impact injuries of the head. The manner of death was ruled a homicide.

At the preliminary hearing, the Commonwealth called Johan Markocki ("Markocki") as a witness. Markocki is the assistant general manager for the bar. He testified that he received a call from security to go to the front door of the bar. Outside the front door, Markocki found [the Victim] on the sidewalk facing the building[,] unconscious and not moving. [Markocki] testified that he, along with the security guards, looked for signs of life such as breathing or stomach movements. Markocki testified that security told him that [the Victim] fell and hit his head on the ground. He stated that there were [three] security officers when he arrived, and he asked if anyone [had] called 911. The security guards responded no and suggested that Markocki should call 911, which he did immediately. He explained that it was not company policy to wait for a manager to call 911 in emergencies. Markocki testified that rescue services came quickly and performed CPR. Markocki testified that when he went back to his office, he played the security footage that covers the front door and observed that [Frye had] walked out into the street and punched [the Victim] in the face. [Markocki] was then asked if he recognized anyone in the courtroom, and Markocki pointed to [Frye]. Markocki testified that [Frye had] worked for Tabu for a few years as a security officer.

On cross-examination, Markocki testified that he found [the Victim] on the sidewalk and that all the security guards agreed with the initial story that [the Victim] fell and hit his head. He continued to testify that he did not know when he began to check for vitals. . . . He testified that when he found [the Victim], he did not see any injuries, blood, or seizures occurring at the time. Markocki stated that [Frye] remained at the scene when emergency services arrived.

On redirect, Markocki testified that he noticed [the Victim] on the first floor of the bar before the incident occurred. He explained that he was behind the bar at this point and noticed [the Victim] stumbling. Another patron [] caught him, and Markocki assisted the patron in getting [the Victim] in a chair. He then called security and told them to either help get [the Victim] home or sober [the Victim] up so he would stop falling around. One of

the security officers he called was [Frye]. Markocki testified that he observed [Frye] sitting at the table with [the Victim] before he went upstairs.

The Commonwealth also called Detective Thorsten Lucke [("Detective Lucke")] as a witness. He put together a compilation video of the security footage that recorded the incident. Detective Lucke testified that the punch occurred between 12:54 a.m. to 12:55 a.m. . . ..

A summary of the video is as follows: the video shows the security guards removing [the Victim] from the bar. [The Victim] appears to fall or has been pushed out of the side door into an alley. Two security guards follow [the Victim] outside and appear to help stabilize him[,] and direct him to leave. [The Victim] then leans against a pole, and the security guards leave him in that location.

[The Victim] eventually walks out of the alley and goes back to the front door of the bar. He begins to dance in front of the bar, and he remains in that area. He then walks away from the bar towards a parked car. He stands as if he is waiting to cross the street for about a minute. Then he reaches down and picks something up off the ground. He continues standing in the street for a moment and then starts dancing on the side of the street. One of the bouncers tries to pull [him] out of the road, but [the Victim] resists and keeps dancing. He then turns and walks back towards the bar. [Frye] walks toward [the Victim] and punches him in the face one time causing him to fall to the ground and hit his head on what appears to be a metal manhole cover.

[The video reveals that the Victim laid immobile and motionless on the ground without any assistance from onlookers.] Eventually, the security officers realize that [the Victim] is not getting up. . . . Two security officers move him from the street onto the sidewalk. The video speeds up, and the employee who testified at the preliminary hearing comes into view and calls 911. Not long after, emergency services arrive [at] the scene.

\* \* \* \*

[Later in] April [] 2022, [Frye] was arrested on homicide charges. A preliminary hearing was held [i]n July [] 2022. At the conclusion of the preliminary hearing, the municipal court judge

held [Frye] over for a third-degree murder charge. Following the preliminary hearing, [Frye moved to quash the return of transcript and/or petitioned for writ of *habeas corpus*, seeking dismissal of the third-degree murder charge. The trial court held a] hearing on [the] motion to quash [i]n December [] 2022[, and, thereafter, the trial c]ourt granted [the] motion. The Commonwealth timely filed a [n]otice of [a]ppeal . . ..

Trial Court Opinion, 3/7/23, at 1-4 (paragraphs re-ordered for clarity). Both the trial court and the Commonwealth complied with Pa.R.A.P. 1925.

The Commonwealth raises the following issue for our review:

Did the lower court err as a matter of law in dismissing the third-degree murder charge for which [Frye] had been held for court, when the evidence at [Frye's] preliminary hearing— including surveillance video showing [Frye] striking and fatally injuring the defenseless [V]ictim and then leaving him lying in the street unconscious and motionless, without attempting to provide or call for aid—would reasonably permit a trier of fact to find that [Frye] acted (a) with gross recklessness or extreme indifference to the value of human life or (b) with specific intent to cause serious bodily injury?

Commonwealth's Brief at 4.

Our standard of review for an order dismissing a criminal charge, based on the sufficiency of the evidence establishing a *prima facie* case at a preliminary hearing, is as follows:

It is settled that the evidentiary sufficiency, or lack thereof, of the Commonwealth's *prima facie* case for a charged crime is a question of law as to which an appellate court's review is plenary. The trial court is afforded no discretion in ascertaining whether, as a matter of law and in light of the facts presented to it, the Commonwealth has carried its pre-trial *prima facie* burden to make out the elements of a charged crime. Therefore, we are not bound by the legal determinations of the trial court.

**Ouch**, 199 A.3d at 923 (internal citations, quotations, and brackets omitted).

- 4 -

With respect to preliminary hearings, this Court has explained the purpose of the hearing is:

> . . . [T]o determine whether the Commonwealth has made out a *prima facie* case for the offenses charged. A *prima facie* case consists of evidence, read in the light most favorable to the Commonwealth, that sufficiently establishes both the commission of a crime and that the accused is probably the perpetrator of that crime. . . .
>
> The Commonwealth establishes a *prima facie* case when it produces evidences that, **if accepted as true**, would warrant the trial judge to allow the case to go to a jury. The Commonwealth need not prove the elements of the crime beyond a reasonable doubt; rather, the *prima facie* standard requires evidence of the existence of each and every element of the crime charged. Moreover, **the weight and credibility of the evidence are not factors at this stage**, and the Commonwealth need only demonstrate sufficient probable cause to believe the person charged has committed the offense. Inferences reasonably drawn from the evidence of record which would support a verdict of guilty are to be given effect, and the evidence must be read in the light most favorable to the Commonwealth's case.

**Id**. (internal citations and quotations omitted; emphasis in original).

The Commonwealth challenges the trial court's order dismissing Frye's third-degree murder charge based on what it asserts was an erroneous conclusion that the Commonwealth failed to put on a *prima facie* case, specifically as to the requisite *mens rea* of the offense. This Court has explained the law relevant to *mens rea* for third-degree murder as follows:

> Pennsylvania retains the common law definition of murder, which is a killing conducted "with malice aforethought." Section 2502 of the Pennsylvania Crimes Code categorizes murder into degrees. **See generally** 18 Pa.C.S.[A.] § 2502(a)-(c). Third-degree murder is defined as "all other kinds of murder," *i.e.*, those committed with malice that are not intentional (first-degree) or committed during the perpetration of a felony (second-degree).

- 5 -

> *Id.* The pertinent provision of the aggravated assault statute [also] requires proof that the defendant "attempt[ed] to cause serious bodily injury to another, or cause[d] such injury intentionally, knowingly or recklessly under circumstances manifesting extreme indifference to the value of human life." 18 Pa.C.S.[A.] § 2702(a)(1). . . . ***[T]he mens rea required for a conviction of aggravated assault, like third-degree murder, is malice; only the result of the crimes differ***. ***See Commonwealth v. O'Hanlon***, 653 A.2d 616, 618 (Pa. 1995) ("Aggravated assault is, indeed, the functional equivalent of a murder in which, for some reason, death fails to occur."); [***Commonwealth v.***] ***Kling***, 731 A.2d [145,] 147 [(Pa. Super. 1999)] ("There is no distinction between the malice essential to third degree murder and that necessary for aggravated assault.").

***Commonwealth v. Packer***, 168 A.3d 161, 168 (Pa. 2017) (some internal citations and quotations omitted; emphasis added).

Regarding the "malice" requirement, this Court has explained:

> . . . Malice is a legal term, implying much more [than the ordinary understanding]. It comprehends not only a particular ill-will, but every case where there is wickedness of disposition, hardness of heart, cruelty, recklessness of consequences, and a mind regardless of social duty, although a particular person may not be intended to be injured.

***Id***. (internal citation omitted). For either third-degree murder or aggravated assault, malice is "present under circumstances where a defendant did not have an intent to kill, but nevertheless displayed a conscious disregard for an unjustified and extremely high risk that his actions might cause death or serious bodily harm." ***Id***. (internal citations and quotations omitted). Malice also "would be present if the defendant had an intent to do the deceased great bodily harm." ***Commonwealth v. Buzard***, 76 A.2d 394, 396 (Pa. 1950).

"Ordinarily[,] where an assault is made with bare fists only, without a deadly weapon, and death results[,] there would only be manslaughter." ***Commonwealth v. Dorazio***, 74 A.2d 125, 129 (Pa. 1950). For such an attack to rise to murder, the intent involved must be to produce a bodily injury "as may be expected to involve serious consequences, either [periling] life or leading to great bodily harm." ***Id***. Crucially, "***[w]hether the malice necessary to constitute murder may be implied from the use of fists alone must depend on the particular circumstances***." ***Id***. at 130 (emphasis added). Relevant factors include "[t]he size of the assailant, the manner in which the fists are used, the ferocity of the attack and its duration[,] and the provocation are all relevant to the question of malice." ***Id***. Additionally, "it is not necessary that the injury be intended to be permanent or dangerous to life[;] it is malicious to intend injury such as to seriously interfere with health and comfort." ***Id***. Indeed, "the Commonwealth may show, and the jury is not precluded from finding, that malice existed even though a deadly weapon was not used. Malice may be found from the attending circumstances." ***Buzard***, 76 A.2d at 396. Lastly, "the *mens rea* required for a conviction of aggravated assault, like third-degree murder, is malice; only the result of the crimes differ." ***Packer***, 168 A.3d at 168.

As noted above, the Commonwealth argues the trial court erred in dismissing Frye's third-degree murder charge based on its conclusion that a single punch, as a matter of law, cannot establish the requisite malice. The

Commonwealth first observes that there is no *per se* rule that would preclude a finding of malice where there is just one punch. ***See*** Commonwealth's Brief at 14. The Commonwealth argues that such a rule would be inconsistent with applicable case law which provides that the particular circumstances of each case must be considered in determining whether there is malice. ***See id***. The Commonwealth maintains that the evidence, when viewed in the light most favorable to it, establishes that Frye had specific intent to cause serious bodily injury or acted recklessly under circumstances manifesting extreme indifference to the value of human life (in which case malice is established for purposes of both aggravated assault and third-degree murder). ***See id***. at 15, 17. The Commonwealth emphasizes the size disparity between Frye and his smaller victim; the unprovoked nature of Frye's blow; "the victim's visible impairment and apparent defenselessness, of which [Frye] would have been aware"; the blow, having occurred in the street, predictably would have concluded with a "hard fall to the pavement"; Frye's "apparent lack of surprise, alarm, or even concern when the victim was . . . rendered motionless and unconscious"; and, lastly, Frye's consciousness of guilt as demonstrated by his lie to Markocki that the victim had just fallen down. ***See id***. at 16.

The trial court considered the Commonwealth's argument and rejected it:

> Here, [Frye] was acting in his capacity as a security guard during his interactions with [the Victim]. While the video did not pick up the audio clear[ly] enough to hear what is said between the two, footage clearly shows that [Frye] walked up to [the

Victim] and punched him in the face while [the Victim] was intoxicated. Aside from the punch, the Commonwealth did not present any other evidence that would suggest malice. Like [in Commonwealth v.] Thomas[, 594 A.2d 300 (Pa. 1991),] where the [a]ppellant punched the decedent when he was aware of [the] decedent's medical issues and intoxication level[, and thereby caused him to die, Frye] also punched the [Victim] likely knowing the [Victim's] level of intoxication. The facts of the instant case do not rise to the level of Buzard[,] where the defendant pursued the decedent and punched him repeatedly with both hands[,] causing death. [Frye] punched [the Victim] one time. Pursuant to Pennsylvania's case law, one punch without a weapon does not provide the requisite malice for third[-]degree murder.

Trial Court Opinion, 3/7/23, at 7.

Following our review, we conclude the trial court committed an error of law in dismissing Frye's third-degree murder charge based on its conclusion that, as a matter of law, a single punch cannot establish malice. As noted above, whether an assault by fists alone demonstrates malice for purposes of third-degree murder, depends on the "particular circumstances" of the case. See Dorazio, 74 A.2d at 130. Factors including "[t]he size of the assailant, the manner in which the fists are used, the ferocity of the attack and its duration[,] and the provocation are all relevant to the question of malice." Id. The evidence, and all inferences therefrom, in the light most favorable to the Commonwealth establish the following: the Victim was 5'10" and 161 pounds, see N.T., 7/19/22, at 4, and while the testimony does not establish Frye's size and weight, it is readily apparent there is a significant size and weight disparity between the two in that Frye is much larger. Accord Frye's Motion to Quash, 11/18/22, at 10-11 (stating, that Frye "was admittedly bigger than the

- 9 -

[Victim] . . ..").  Additionally, the video reveals that Frye, with no provocation, and in his capacity as a bouncer, and knowing the Victim's severe intoxication prior to the punch, deliberately walked up to the Victim, who was visibly inebriated and unaware that Frye was about to hit him, and punched the Victim in the face, causing him to fall and causing his head to land on a man-hole cover, after which he lay unmoving on the ground.  *See* N.T., 7/19/22, Ex. C-2, at 5:28-30 (identification of the Victim);[3] *id*. at 7:20-54 (the Victim non-violently resisting when Frye's colleague attempted to pull him out of the street; and then Frye walking from some distance up to the Victim and punching him in the face without provocation); *id*. at 7:55-8:52 (the Victim lying motionless on the ground with no attempts to administer aid); *id*. at 9:10-10:28 (showing, from a different angle, the Victim dancing in the street and Frye walking up and hitting him in the face, after which the Victim fell violently to the ground and lay there motionless).  Given the size disparity, the lack of provocation, Frye's knowledge that the Victim was intoxicated and defenseless, we conclude the evidence, when viewed in the light most favorable to the Commonwealth, establishes a *prime facie* case of Frye's malice, that is, his conscious disregard for an unjustified and extremely high risk that his actions might cause death or serious bodily harm.  *See*, *e.g.*, *Interest of N.A.D.*, 205 A.3d 1237, 1240-41 (Pa. Super. 2019) (single punch

_____

[3] Citations to the video reference the runtime of the video rather than the timestamp on the screen.

sufficient evidence a juvenile "acted recklessly under circumstances manifesting extreme indifference to the value of human life"); **Commonwealth v. Faulk**, 928 A.2d 1061, 1070 (Pa. Super. 2007) ("Each case must be evaluated on its own particular facts, but under appropriate circumstances, even a single punch to the face can constitute aggravated assault"); **Commonwealth v. Patrick**, 933 A.2d 1043, 1047-48 (Pa. Super. 2007) (single punch to an unsuspecting victim sufficient to show at a preliminary hearing "reckless indifference under circumstances which virtually assured serious bodily injury").

The trial court's reliance on **Thomas** and **Commonwealth v. MacArthur**, 629 A.2d 166, 169 (Pa. Super. 1993) is misplaced. In **Thomas**, this Court concluded a single punch to the face was insufficient to establish the requisite malice for third-degree murder. However, there, this Court noted the defendant and decedent were "approximately equal in size," had been "drinking together for hours," and there was a single blow. **See** 594 A.2d at 303. We also noted that while the punch knocked the decedent down and he died after his head struck the pavement, "there was no testimony that [the] blow was a powerful one, merely that it was unexpectedly delivered to a man with a stiff neck." **Id**. Conversely, here, Frye and the Victim were not approximately equal in size; they had not been drinking together for hours, but, instead, the Victim was intoxicated while Frye was not; and the video

evidence shows that the blow was indeed a powerful one delivered by a person in control of his faculties to a person incapable of defending himself.

In **MacArthur**, the decedent and MacArthur got into a disagreement about MacArthur's dog urinating on the decedent's lawn. As we described it, "[a] physical confrontation ensued[,] and the two men tangled on [the decedent's] porch. MacArthur pushed the bigger man away. [The decedent] lost his balance, somersaulted backwards over a railing, fell down five steps and landed on the back of his neck." 629 A.2d at 168. There, we concluded the "injury was the tragic but improbable result of a single push." **Id**. at 169. Here, there was no physical confrontation between Frye and the Victim; nor was there a push during a physical confrontation; instead, Frye walked up to the intoxicated and unsuspecting Victim incapable of defending himself, and landed an unprovoked punch to his face. **Thomas** and **MacArthur** are thus distinguishable. Based on the foregoing, we reverse the trial court's order granting Frye's motion to quash the third-degree murder charge, and remand for further proceedings consistent with this decision.

Order reversed. Case remanded. Jurisdiction relinquished.

Judgment Entered.

_Benjamin D. Kohler_

Benjamin D. Kohler, Esq.
Prothonotary

Date: 7/15/2024