J-A29019-14

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| COMMONWEALTH OF PENNSYLVANIA, | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| Appellee | |
| v. | |
| JOHNATHAN KEITH GODINES, | |
| Appellant | No. 1904 WDA 2013 |

Appeal from the Judgment of Sentence entered October 17, 2013
in the Court of Common Pleas of Fayette County,
Criminal Division, at No(s): CP-26-CR-0000524-2012

BEFORE: BOWES, ALLEN, and STRASSBURGER*, JJ.

MEMORANDUM BY ALLEN, J.:                    **FILED DECEMBER 1, 2014**

Johnathan Keith Godines, ("Appellant"), appeals from the judgment of sentence imposed following his conviction for third degree murder, aggravated assault[1], and other related offenses. Because we find that Appellant's aggravated assault conviction merged with his third degree murder conviction, we vacate the judgment of sentence as to aggravated assault only, and affirm the judgment of sentence in all other respects.

The trial court presented the facts relative to this action as follows:

> [T]he trial evidence establishes that the crimes occurred on November 15, 2011 in the city of Brownsville, Fayette County, Pennsylvania. [Appellant], wearing a dark colored hooded sweatshirt, was observed by several trial witnesses as he approached the now-deceased victim as the latter sat in the

---

[1] 18 Pa.C.S.A. §§ 2502(c) and 2702(a)(1), respectively.

*Retired Senior Judge assigned to Superior Court.

driver's seat of his car, which was parked curbside along a street in Brownsville. Loud apparent arguing attracted the attention of Commonwealth witnesses Megan Boger and Tabitha Zieglar, who each testified that they observed [Appellant] kicking the side of the victim's car six or seven times. N.T. pp. 30, 45-46, 49, 56-57.

Each witness then saw [Appellant] open the driver's door of the victim's car and drag the victim out to the ground, and then [Appellant] leaning and shifting his body toward the victim in such a way that both of them knew [Appellant] was kicking the man on the ground, with force, at least six times. Id. pp. 23-24, 30-32, 41-42, 45-47. Each of these named witnesses then saw [Appellant] walk away. Id. pp. 36-37, 48, 104. The women observed the victim get up from the ground and slowly pursue [Appellant] around a building and out of their sight. Id. pp. 25, 37, 39-40, 48, 59.

Jerry Abbey, a bartender in the Antique Bar and Grill, in front of which business a further altercation took place, also testified as a Commonwealth witness. Id. pp. 102-105, 110-111. He told the jury that he could see [Appellant], whom he knew, kicking and swinging his fists at something approximately fifteen times. Id. Three other Commonwealth witnesses, Fawn Petrosky and her daughters, Emma and Brianna, testified that they saw an elderly man (the victim) cross the street in front of them as they were driving through Brownsville. Id. pp. 70, 77, 82,92-93, and then heard loud argumentative voices which drew their attention to the scene behind them. Id. There they could see [Appellant] swinging his arm to punch the older victim several times. Id. pp. 71-72, 84-85, 93. [Appellant], taller than the victim to begin with, appeared to be standing on the street's curb so as to be higher up than the victim. Id. p. 85, 94. Brianna Petrosky observed the older man trying to protect himself by ducking down and putting his hands up over his head, while [Appellant] punched downward at him in a chopping motion. Id. pp. 94-95. Emma Petrosky then used her cell phone to call 9-1-1 to report the incident. Id. p. 85.

A short time later, witnesses Boger and Zieglar, who were still in the area of Brownsville where they had seen [Appellant] pull the victim out of his car and kick him in the street, saw the elderly victim returning to his car. At that time, they could see that he had a split lip and blood on his mouth, as well as a scratch on the side of his face and dirt and pebbles on his body.

Id. pp. 37-38, 49. The victim was limping and appeared to be hurt. Id. p. 50. In addition, he was acting as though he was not sure what was going on. Id. When the first responding police officer, Brownsville police officer Robert Mammarella, arrived on the scene, he was able to have a coherent conversation with the victim, but his condition noticeably deteriorated before the ambulance arrived. Id. p. 190. The victim was transported to a hospital in Pittsburgh, Id., where he died on December 1, 2011. At trial, the Commonwealth's expert, forensic pathologist Doctor Todd Luckasevic, who performed the autopsy on December 2, 2011, testified that the victim suffered a thalamic hemorrhage and associated infarction with superimposed acute hemorrhage. Id. p. 238. He went on to opine that the victim likely had an adrenaline rush while he was being assaulted, and the adrenaline rush caused an increase in his blood pressure which in turn led to the thalamic bleed. Id. p. 140. He then said there was also an infarction in the back of the brain that cut off the blood supply and caused necrosis there, Id. p. 141, 143, which occurred when atherosclerotic plaque broke off and lodged in an artery, clogging it. Id. p. 148. [The victim] contracted pneumonia at some point, and the acute cause of death was the severe bronchopneumonia. Id. p. 150.

Nevertheless, Doctor Luckasevic ruled the death a homicide based on the chain of events, e.g., the assault caused him to be taken to one hospital where he exhibited signs of the thalamic hemorrhage, leading to him being life-flighted to Mercy Hospital in Pittsburgh, where he was placed on life-supporting mechanisms. Id. p. 151. The thalamic bleed caused weakness on his left side, which caused the victim to aspirate, in turn causing the acute bronchopneumonia. Id. p. 152. The expert acknowledged that the victim had a medical history including hypertension/high blood pressure, atrial fibrillation for which he was prescribed the drug Coumadin, and related changes to the heart muscle and the kidneys. Id. pp. 153-154.

Trial Court Opinion, 12/19/13, at 3-5.

Procedurally, the trial court explained:

This matter is before the Court as a direct appeal filed by [Appellant] … following a jury trial wherein he was found guilty on October 10, 2013, of Third Degree Murder at Count I, Aggravated Assault at Count II, Simple Assault at Count III,

Recklessly Endangering Another Person at Count IV, and lastly at Count V, Disorderly Conduct, as the result of a physical altercation and the subsequent death of the other participant, John Eicholtz [the "victim"]. [Appellant] was sentenced on October 17, 2013 at Count 1, Murder in the Third Degree, to a term of imprisonment of not less than twenty years nor more than forty years, and at Count 2, Aggravated Assault, to a concurrent term of not less than ten years nor more than twenty years. At Counts 3, 4, and 5, the Court accepted the guilty verdicts without the imposition of further penalty.

*Id.* at 1.

On October 22, 2013, Appellant filed a post-sentence motion for modification of sentence in which he averred:

2. At the time of sentencing, [Appellant] was thirty-seven years old, having been born on May 25, 1976.

3. That [Appellant] believes his sentence is harsh, severe, and excessive in view of the circumstances surrounding this matter.

4. That [Appellant] believes a lesser sentence would meet any rehabilitative needs of [Appellant].

5. That sentencing [Appellant] to a separate concurrent sentence for the crime of aggravated assault when aggravated assault is a lesser included offense to third degree murder is an illegal sentence.

6. That the trial court abused its discretion in sentencing [Appellant] to the maximum allowable sentence for the crimes of third degree murder and aggravated assault.

7. That [Appellant] will be fifty-five (55) years old when he reaches his minimum sentence and seventy-five (75) years old when he reaches his tail.

8. For all intents and purposes, the Court has given [Appellant] a life sentence.

Appellant's Post-Sentence Motion for Modification of Sentence, 10/22/13, at 1-2. On October 28, 2013, the trial court denied Appellant's post-sentence

motion for modification of sentence. On November 18, 2013, Appellant filed a notice of appeal. Appellant and the trial court complied with Pa.R.A.P. 1925.

Appellant presents the following issues for our review:

I. WHETHER THE COMMONWEALTH FAILED TO ADDUCE SUFFICIENT EVIDENCE AT THE TIME OF TRIAL TO SUPPORT THE CONVICTION OF THE APPELLANT FOR THE CRIME OF THIRD-DEGREE MURDER BEYOND A REASONABLE DOUBT OR WHETHER THE CONVICTION WAS AGAINST THE WEIGHT OF THE EVIDENCE AS TO THE ELEMENT OF MALICE?

II. WHETHER THE COMMONWEALTH FAILED TO ADDUCE SUFFICIENT EVIDENCE AT THE TIME OF TRIAL TO SUPPORT THE CONVICTION OF THE APPELLANT FOR THE CRIME OF AGGRAVATED ASSAULT BEYOND A REASONABLE DOUBT OR WHETHER THE CONVICTION WAS AGAINST THE WEIGHT OF THE EVIDENCE AS TO THE ELEMENT OF RECKLESSNESS?

III. WHETHER THE COMMONWEALTH FAILED TO ADDUCE SUFFICIENT EVIDENCE AT THE TIME OF TRIAL TO SUPPORT THE CONVICTION OF THE APPELLANT FOR THE CRIME OF THIRD-DEGREE MURDER OR AGGRAVATED ASSAULT BEYOND A REASONABLE DOUBT OR WHETHER THE CONVICTION WAS AGAINST THE WEIGHT OF THE EVIDENCE AS TO THE ELEMENT OF CAUSATION?

IV. WHETHER THE TRIAL COURT ERRED IN REFUSING TO DIRECT THE JURY THAT [APPELLANT] DOES NOT "TAKE THE VICTIM AS HE FINDS HIM" WHEN THE COMMONWEALTH REPEATEDLY ARGUED THE SAME IN CLOSING ARGUMENT?

V. WHETHER THE COMMONWEALTH FAILED TO DISPROVE THE JUSTIFICATION OF SELF DEFENSE BEYOND A REASONABLE DOUBT?

VI. WHETHER THE TRIAL COURT ERRED IN INSTRUCTING THE JURY THAT [APPELLANT] HAD A DUTY TO RETREAT WHEN

> INSTRUCTING THE JURY ON THE JUSTIFICATION OF SELF DEFENSE?
>
> VII.    WHETHER THE TRIAL COURT ERRED IN PERMITTING THE COMMONWEALTH TO INTRODUCE AND PLAY FOR THE JURY A RECORDED JAIL CONVERSATION BETWEEN THE [APPELLANT] AND ANOTHER PARTY?
>
> VIII.   WHETHER THE TRIAL COURT ERRED IN SENTENCING [APPELLANT] TO A SEPARATE CONCURRENT SENTENCE FOR THE CRIME OF AGGRAVATED ASSAULT WHEN AGGRAVATED ASSAULT IS A LESSER INCLUDED OFFENSE OF THIRD DEGREE MURDER?
>
> IX.     WHETHER THE TRIAL COURT ABUSED ITS DISCRETION IN SENTENCING [APPELLANT] TO THE MAXIMUM ALLOWABLE SENTENCE FOR THE CRIMES OF THIRD DEGREE MURDER AND AGGRAVATED ASSAULT?

Appellant's Brief at 7-8. Appellant's first, second, and third issues challenge the sufficiency and weight of the evidence supporting his convictions, and therefore, we address them together. Specifically, Appellant contends that "[t]he Commonwealth failed to adduce sufficient evidence to support a verdict of guilt for the crimes of Third-Degree Murder and Aggravated Assault, particularly with respect to the elements of malice, recklessness, and causation." *Id.* at 27.

In reviewing Appellant's sufficiency claims, we recognize:

> The standard we apply in reviewing the sufficiency of the evidence is whether viewing all the evidence admitted at trial in the light most favorable to the verdict winner, there is sufficient evidence to enable the fact-finder to find every element of the crime beyond a reasonable doubt. In applying the above test, we may not weigh the evidence and substitute our judgment for the fact-finder. In addition, we note that the facts and circumstances established by the Commonwealth need not preclude every possibility of innocence. Any doubts regarding a defendant's guilt may be resolved by the fact-finder unless the

evidence is so weak and inconclusive that as a matter of law no probability of fact may be drawn from the combined circumstances. The Commonwealth may sustain its burden of proving every element of the crime beyond a reasonable doubt by means of wholly circumstantial evidence. Moreover, in applying the above test, the entire record must be evaluated and all evidence actually received must be considered. Finally, the [finder] of fact while passing upon the credibility of witnesses and the weight of the evidence produced, is free to believe all, part or none of the evidence.

***Commonwealth v. Jones***, 886 A.2d 689, 704 (Pa. Super. 2005) (internal citations omitted).

In rebutting Appellant's sufficiency claims, the trial court explained:

The Court notes that, viewing the evidence in the light most favorable to the Commonwealth as verdict winner (see Commonwealth v. Watley, __ A.3d __, 2013 WL 6164340 (Pa. Super. 2013)), there can be no reasonable doubt that [Appellant], using forceful kicks and numerous punches, physically assaulted [the victim] after dragging him out of his vehicle. By statutory definition, third degree murder is an unlawful killing with malice, but lacking the specific intent to kill. 18 Pa.C.S. § 2502 (c). For purposes of establishing third degree murder, malice is not merely ill-will, but encompasses hardness of heart, wickedness of disposition, recklessness of consequences, and an utter disregard of social duty. Commonwealth v. Truong, 36 A.3d 592 (Pa. Super. 2012). The requisite malice may be inferred by the jury after consideration of the totality of the circumstances. Id. Additionally, as to the causation element of the murder, there can be more than one direct cause of death. [Appellant's] actions do not have to be the immediate cause of death, if they commenced an unbroken chain of events which led to the death of the victim. Furthermore, [Appellant], whose conduct is a direct cause of the victim's death, as testified to by Doctor Luckasevic, cannot avoid liability by reliance on the victim's preexisting physical infirmities which may also have contributed to his death. Commonwealth v. Paolello, 542 Pa. 47, 665 A.2d 439 (Pa. 1995). There is no insufficiency of evidence herein on the third degree murder conviction. The lesser included offense of aggravated assault as a felony of the first degree is established when the perpetrator

- 7 -

"attempts to cause serious bodily injury to another, or causes such injury intentionally, knowingly or recklessly under circumstances manifesting extreme indifference to the value of human life." As can be seen in the summary of the evidence above, and more fully in the record as a whole, the victim suffered serious bodily injury, evidenced by his bloody lip and the subdural hemorrhages in his temple area of his head observed during the autopsy, whether or not those injuries had any causative impact on his subsequent death. The questions of [Appellant's] intent to inflict those serious injuries, and/or his recklessness in doing so, were properly decided by the jury, which also apparently found the circumstances of the infliction of the injuries to manifest extreme indifference to the value of [the victim's] life. See Commonwealth v. Spruill, __ A.3d __, 2013 WL 6134824 (Pa. 2013). The trial evidence is certainly sufficient to support [Appellant's] conviction of aggravated assault.

Trial Court Opinion, 12/19/13, at 5-7. Our review of the record comports with the trial court's presentation of the facts in this case and the trial court's determination that there was sufficient evidence to support Appellant's convictions for third degree murder and aggravated assault. Indeed, Appellant's statement to law enforcement and his trial testimony belie Appellant's sufficiency challenges.

Chief Stanley P. Jablonsky, from the Brownsville Police Department, testified that he was "present for an interview that involved Officer Mammarella, [and] [Appellant] … that occurred on November 21, 2011[.]" N.T., 10/8/13, at 230. Chief Jablonsky testified that Appellant was given his **Miranda** warnings prior to the interview, and that Appellant "understood" and "sign[ed]" a "written **Miranda** waiver form." *Id.*

After refreshing his recollection by reviewing his handwritten notes of Appellant's statement, Chief Joblonsky testified that Appellant stated that

"he was not aware of who [the victim] was, but [the victim] had been calling [Appellant's and his paramour Amber McDonald's] cell phone and speaking to them while they were at West Penn Hospital." *Id.* at 231. Chief Joblonsky explained that the calls occurred "approximately one to one and half months" prior to the interview. *Id.*

Chief Jablonsky further testified about Appellant's statement to law enforcement as follows:

> [Appellant] said that [the victim] was going to shoot and kill [Appellant] on sight and [the victim] … had been bringing Amber McDonald cigarettes and money for a couple of months. [Appellant] said on the night of the incident that he was sitting in front of the Bank Building when he saw [the victim] pull up … on High Street, just beyond where he was sitting and did a u-turn in the street. And [Appellant] said that at the time [the victim] pulled to … his location and flashed a firearm at [Appellant]. Then [Appellant] responded in saying that [the victim] left that location and pulled to the back of the Bank Building and [Appellant] followed the vehicle to the rear of the Bank Building. And [Appellant] said when he got there, that he started kicking the door and window of the vehicle and opened the door and had struck [the victim]. [Appellant] said at the time that he thought that [the victim] had enough, so he walked away. And [Appellant] had gone toward the Antique [Bar]. Then [Appellant] said while he was at the Antique [Bar], [the victim] had returned to [Appellant's] location and had walked around the Bank Building to the [bar] with his hands up in the air, ready to fight. [Appellant] said that at that time he – [Appellant] - had struck [the victim] to the face two times, knocking him to the ground. [Appellant] said that he thought [the victim] started to stand up and [Appellant] couldn't believe that he was getting back up and [Appellant] did kick [the victim] to the face, knocking [the victim] to the ground again.

*Id.* at 231-233.

On cross-examination, Chief Jablonsky acknowledged that Appellant "never adopted … or signed" Chief Jablonsky's handwritten notes of Appellant's interview. However, the foregoing testimony viewed in the light most favorable to the Commonwealth, highlights that Appellant was the initial aggressor of the physical altercation between Appellant and the victim, establishes the relentless nature of Appellant's assault on the victim, and reinforces that Appellant did not stop until he "knock[ed] [the victim] to the ground again." *Id.* at 236, 233. Significantly, the statement shows that Appellant concluded the fight with the victim with a "kick" to the victim's face. *Id.* at 233. Malice, recklessness, and intent concerning Appellant's actions vis á vis the victim, as required to support Appellant's convictions for third degree murder and aggravated assault, are evident in Chief Jablonsky's testimony.

Appellant's trial testimony also belies his sufficiency claims. Appellant testified that he had "contact with [the victim]" in "the time around the birth of [Appellant's son] Riley [Godines]." N.T., 10/9/13, at 315. Riley Godines was born on September 14, 2011. *Id.* at 317. Appellant testified that "[w]hen my son was born in Uniontown Hospital he had to go to West Penn [Hospital]. I was down there with him and the nurses patched a phone call through and it was a man on the phone and he asked for Amber McDonald. I said that she is not here. I hung up the phone and he calls back right away." *Id.* at 315-316. Appellant stated that the second call was "the same voice," and the caller identified himself as "John." *Id.* at 316. The "same

- 10 -

voice" called a third time, and when Appellant subsequently "spoke to Amber," she "told [Appellant] that it must have been [the victim] that called." *Id.* According to Appellant, during the third call, the victim called Appellant a "F'n punk." *Id.* at 317. Appellant stated that the victim then called Amber McDonald's cell phone and threatened Appellant by stating: "I have lived my life, I will just go ahead and kill you … you're just a fu—in' no good punk and … I am going to shoot you on sight." *Id.*

Appellant further testified approximately six weeks later, on November 15, 2011, Appellant was "sitting on a stoop" in front of the Bank Building where he lived. *Id.* at 319; 314-315. Appellant "recognize[d]" the victim's white car "come[] by and slow[] down" and "pull[] a u-turn in the middle of the road", which "stopped traffic." *Id.* at 319. Appellant testified that the victim's car came "to a complete stop" and the victim "gesture[d] … and had a pistol in his hand." *Id.* at 319-320. The victim then drove "behind the Bank Building." *Id.* at 320.

Appellant explained that he "pursue[d] [the victim]" after the victim "flash[ed] the pistol" at Appellant. *Id.* Appellant testified that he "want[ed] to head [the victim] off before he parks the car and gets out with the gun." *Id.* Appellant explained that when he approached the victim, Appellant "was screaming … [and saying] what the fu-k is your problem." *Id.* Appellant testified that he "kicked the window [of the victim's car]," and that the victim "must have called me a punk fifty times during this altercation." *Id.* at 320-321. Appellant conceded that he "kicked the window and kicked the

- 11 -

door a couple of times[.]" *Id.* at 321. Appellant further admitted that after the victim's car door "gets open, I'm in between the door here and lean in and strike him and I believe that I caught him in the left side of the cheek bone there ... with my fist." *Id.* Appellant acknowledged that he struck the victim with "[his] fist" approximately "three or four times[.]" *Id.* Appellant claimed that he then "retreated to the front of the building" when the victim's car began to move forward. *Id.* at 322. After Appellant reached the front of the building and crossed to "the other side of the road" on "High Street," the victim approached Appellant. *Id.* at 323. Appellant testified that when the victim came "across the street, I am on top of the sidewalk" and the victim "comes up on to the sidewalk and into my business. I swing and hit [the victim] about two times." *Id.* at 324. After that the victim grabbed Appellant's "hoody and [the victim was] going ... down and pulling me down with him ... I grab a hold of the hoody ... and I want to get free and that is when I kick him one time in the jaw and then I retreat." *Id.* Appellant testified that he was "six foot" in height and weighed 205 pounds at time. *Id.* at 325.

On cross-examination, Appellant denied that there was "some reason that [Appellant] could not retreat" prior to confronting the victim in the rear of the Bank Building. *Id.* at 329. Significantly, Appellant testified that "[n]ow that I look back on it, I could have [retreated]. At the time that was my decision that I made [to follow the victim to the rear of the Bank Building]. I wish now that I would have [retreated]." *Id.* Appellant further

expressed "I made a bad decision. I chose to go back and confront [the victim] about the situation and handle it instead of retreating right away. I made a bad decision by going around the building." *Id.* at 338.

Given the foregoing, we are not persuaded by Appellant's argument that he lacked the requisite malice and recklessness to support his convictions. Rather, we find that based on Appellant's own testimony, Appellant had preexisting acrimonious contacts with and anger toward the victim, that Appellant initiated a physical confrontation with the victim, a 75 year old male, and that the ensuing fight involved physical blows to the victim which resulted in a stroke, pneumonia, and death.

Moreover, applicable case law supports the trial court's determination that Appellant's sufficiency claims lack merit. We have explained:

> Third-degree murder is defined in the Crimes Code as "all other kinds of murder" other than first degree murder or second degree murder. 18 Pa.C.S. § 2502(c). The elements of third-degree murder, as developed by case law, are a killing done with legal malice. *Commonwealth v. Pitts,* 486 Pa. 212, 404 A.2d 1305 (1979). Malice, express or implied, is an essential element of murder, *Commonwealth v. Commander,* 436 Pa. 532, 260 A.2d 773 (1970), and is the distinguishing factor between murder and the lesser degrees of homicide. *Commonwealth v. Culmer,* 463 Pa. 189, 344 A.2d 487 (1975).
>
> The traditional definition of malice was set forth in *Commonwealth v. Drum,* 58 Pa. 9 (1868):
>
>> Malice is a legal term, implying much more. It comprehends not only a particular ill-will, but every case where there is wickedness of disposition, hardness of heart, cruelty, recklessness of consequences, and a mind regardless of social duty, although a particular person may not be intended to be injured. Murder, therefore, at common law embraces cases where no intent to kill

- 13 -

existed, but where the state or frame of mind termed malice, in its legal sense, prevailed.

*Id.* at 15. *See also Commonwealth v. Hilbert,* 476 Pa. 288, 382 A.2d 724 (1978); *Commonwealth v. Polimeni,* 474 Pa. 430, 378 A.2d 1189 (1977); *Commonwealth v. Green,* 464 Pa. 557, 347 A.2d 682 (1975).

In *Commonwealth v. Malone,* 354 Pa. 180, 47 A.2d 445 (1946), the Pennsylvania Supreme Court clarified the concept of malice:

When an individual commits an act of gross recklessness for which he must reasonably anticipate that death to another is likely to result, he exhibits that "wickedness of disposition, hardness of heart, cruelty, recklessness of consequences, and a mind of social duty" which proved that there was at that time in him "the state or frame of mind termed malice."

*Id.* at 183, 47 A.2d at 447 (quoting *Commonwealth v. Drum,* supra.).

**Commonwealth v. MacArthur,** 629 A.2d 166, 167-168 (Pa. Super. 1993).

In **MacArthur,** we found that the record did not support an inference

of malice, and we reasoned:

Malice may not be inferred simply from the fact that a person "performed a certain act and that act brought about the death of another." *Commonwealth v. Reilly,* 519 Pa. 550, 549 A.2d 503 (1988). The case law is clear that a single blow, without a weapon, is, ordinarily, not sufficient to establish malice. *Commonwealth v. Moore,* 488 Pa. 361, 412 A.2d 549 (1980); *Commonwealth v. Buzard,* 365 Pa. 511, 76 A.2d 394 (1950); *Commonwealth v. Dorazio,* 365 Pa. 291, 74 A.2d 125 (1950). Whether malice may be inferred where only fists are used must depend on the particular circumstances of the case, such as the assailant's size, the manner in which the fists are used, the ferocity and duration of the attack, and provocation, if any. *Moore, supra.*

In *Commonwealth v. Stehley,* 350 Pa.Super. 311, 504 A.2d 854 (1986), this court found the defendant was not guilty of murder but guilty of involuntary manslaughter where he

- 14 -

shoved a sixty-two year old man over a porch railing so that he hit the ground head first four feet below and died. In the recent case of *Commonwealth v. Thomas,* 527 Pa. 511, 594 A.2d 300 (1991), the Pennsylvania Supreme Court held that proof of defendant's single punch to victim's face was insufficient to support a finding of malice required for a third-degree murder conviction, even though victim's chronically stiff neck which made it difficult for him to turn his head was readily apparent and had been a topic of conversation at gathering where defendant was present, the assault was unexpected, the punch was delivered from victim's "blind side," and the victim was intoxicated.

In the instant case, the injury was the tragic but improbable result of a single push. As in *Stehley* and *Thomas,* there is nothing in the record here which would support an inference of malice leading to a verdict of murder in the third degree. *Cf. Dorazio,* 365 Pa. at 299-300, 74 A.2d at 129 ("Ordinarily where an assault is made with bare fists only, without a deadly weapon, and death results there would only be manslaughter.... [W]here the assault is not committed with a deadly weapon, the intent must be clearly felonious, or the death will subject [the defendant to] only the charge of manslaughter.") The uncontroverted evidence simply does not warrant the inference of legal malice which was justified in *Moore, Buzard* and *Dorazio, supra,* by brutal prolonged, ferocious assaults carried out by larger, more powerful assailants.

*MacArthur,* 629 A.2d at 168-169. The lack of malice in *MacArthur* from the defendant's single fatal push of the victim, is distinguishable from the repetitive and violent actions of Appellant in this case. Here, as in *Moore* and *Dorazio*, the record supports Appellant's convictions for aggravated assault and third degree murder because Appellant, a much younger, taller and heavier individual than the victim, engaged in a physical attack, spanning two locations, of the 75 year old victim, using fists and feet, and resulting in the victim's stroke and subsequent death.

- 15 -

We further reject Appellant's causation challenge. Recently, in ***Commonwealth v. Spotti,*** 94 A.3d 367 (Pa. Super. 2014) (*en banc*), we affirmed an aggravated assault while driving under the influence conviction, where the appellant contended that his erratic driving was not the legal cause of the accident when another driver veered off the road to avoid appellant, seriously harming four individuals. In rejecting appellant's lack of causation argument, we explained:

> In [*Commonwealth v.] Nunn,* [947 A.2d 756 (Pa. Super. 2008)], we reiterated:
>
> > To establish criminal causation, the Commonwealth must prove that the defendant's conduct was so directly and substantially linked to the actual result as to give rise to the imposition of criminal liability. *Commonwealth v. Long,* 425 Pa. Super. 170, 624 A.2d 200, 203–204 (1993), *appeal denied,* 535 Pa. 645, 633 A.2d 150 (1993) (*citing Commonwealth v. Rementer,* 410 Pa. Super. 9, 598 A.2d 1300, 1304 (1991), *appeal denied,* 533 Pa. 599, 617 A.2d 1273 (1992)).
> >
> > In *Rementer,* we set forth a two-part test for determining criminal causation. First, the defendant's conduct must be an antecedent, but for which the result in question would not have occurred. *Rementer,* 598 A.2d at 1305; 18 Pa.C.S.A. § 303(a)(1). A victim's death cannot be entirely attributable to other factors; rather, there must exist a "causal connection between the conduct and the result of conduct; and causal connection requires something more than mere coincidence as to time and place." *Rementer,* 598 A.2d at 1305, n. 3 (*quoting* LaFave and Scott, *Substantive Criminal Law,* Vol. 1, Ch. 3., at 391–392 (1986)). Second, the results of the defendant's actions cannot be so extraordinarily remote or attenuated that it would be unfair to hold the defendant criminally responsible. *Rementer,* 598 A.2d at 1305.
> >
> > As to the first part of the test, the defendant's conduct need not be the only cause of the victim's death in order to

establish a causal connection. *Rementer,* 598 A.2d at 1305. "Criminal responsibility may be properly assessed against an individual whose conduct was a direct and substantial factor in producing the death even though other factors combined with that conduct to achieve the result." *Long,* 624 A.2d at 203 (*citing Commonwealth v. Skufca,* 457 Pa. 124, 321 A.2d 889 (1974), *appeal dismissed,* 419 U.S. 1028, 95 S.Ct. 510, 42 L.Ed.2d 304 (1974)). The second part of the test is satisfied when the victim's death is the natural or foreseeable consequence of the defendant's actions. *Id. (citing Rementer* and *Commonwealth v. Paquette,* 451 Pa. 250, 301 A.2d 837 (1973)). "Where the fatal result was an unnatural or obscure consequence of the defendant's actions, justice would prevent us from allowing the result to have an impact upon a finding of the defendant's guilt." *Id.* at 204, 624 A.2d 200 (*citing Rementer,* 598 A.2d at 1306–1307).

*Nunn,* 947 A.2d at 760.

Recently, in *Commonwealth v. Fabian,* 60 A.3d 146 (Pa.Super.2013), we expressed:

In seeking to define the requirement that a criminal defendant's conduct be a direct factor in the death of another, the courts of this Commonwealth have held that 'so long as the defendant's conduct started the chain of causation which led to the victim's death, criminal responsibility ... may be properly found.'

*Fabian, supra,* at 152 *citing Commonwealth v. McCloskey,* 835 A.2d 801, 808 (Pa.Super.2003).

**Spotti,** 94 A.3d at 375-376. Here, more directly than in **Spotti**, where the appellant's car never struck the injured victims or their vehicles, we find causation between Appellant's physical attack on the victim and the victim's subsequent death following a stroke, pneumonia, and his removal from a ventilator.

- 17 -

Indeed, the testimony of Appellant's expert witness, Dr. Maxim Hammer, a neurologist and stroke expert, supports causation between Appellant's actions and the victim's death. Dr. Maxim testified that he "was the first physician attending to [the victim] for stroke services" upon the victim's admission to the hospital the day of the attack. N.T., 10/9/13, at 343. Dr. Hammer testified that the victim's stroke was "most likely cause[d]" by "hypertension," which is high blood pressure. *Id.* at 350. The victim then "ran into some complications of the stroke such as pneumonia[.]" *Id.* at 346. Dr. Hammer explained that "[f]rom review of the records, the treating team that took over for me had discussions with the family and it was decided that the patient wouldn't want to survive severe stroke with resultant severe disability and his status was changed to comfort measures only … mean[ing] a state of palliative care, when all medications are taken away and the patient is allowed to pass away peacefully." *Id.* at 348.

On cross-examination, Dr. Hammer conceded that the victim had a thalamic hemorrhage "caused … in part by an elevation in [the victim's] blood pressure," and that the victim's "blood pressure was very high upon presentation" to the hospital." *Id.* at 354. Dr. Hammer agreed that it is "possible that there could be some catalyst for the spike in blood pressure for hemorrhage to occur[.]" *Id.* Dr. Hammer affirmed that "if a traumatic event had occurred … that [could] be a catalyst for a spike in blood pressure[.]" *Id.* at 354-355. Further, "[o]ver excitement" and "fear" could

- 18 -

be possible "catalyst[s] for a spike in blood pressure[.]" *Id.* at 355. Dr. Hammer testified that it was not likely, based on his "review in this case," that the victim "would have contracted pneumonia" if he had not "suffered this thalamic hemorrhage[.]" *Id.* at 357. Dr. Hammer confirmed that "[the victim] contracting pneumonia in the hospital is a result of the thalamic hemorrhage[.]" *Id.* at 357-358.

As to Appellant's weight claims, based on our review of the record, including Appellant's own trial testimony recounted above, we agree with the trial court's determination that "[t]he guilty verdicts relative to [Appellant's convictions for third degree murder and aggravated assault] do not shock the Court's conscience so as to require the grant of a new trial in order to prevent a miscarriage of justice." Trial Court Opinion, 12/19/13, at 7 *citing* **Commonwealth v. Sullivan,** 820 A.2d 795, n. 11 (Pa. Super. 2003); **see also Commonwealth v. Dupre,** 866 A.2d 1089, 1103 (Pa. Super. 2005) (citation omitted) ("Because the trial judge has had the opportunity to hear and see the evidence presented, an appellate court will give the gravest consideration to the findings and reasons advanced by the trial judge when reviewing a trial court's determination that the verdict is against the weight of the evidence.").

In his fourth issue, Appellant contends that the trial court erred in overruling his objections to the Commonwealth's comments during closing arguments that Appellant "t[ook] the victim as he f[ound] him." Appellant's Brief at 45. Appellant fails to cite a single case for his proposition that he is

entitled to a mistrial based on the prosecutor's comments. *See* Appellant's Brief at 45. Moreover, while Appellant incorporates "arguments set forth in the preceding sections," Appellant only dedicates 15 lines to this argument. *Id.* It is beyond peradventure that undeveloped claims will be deemed waived, and will not be considered on appeal. ***See Commonwealth v. Tielsch***, 934 A.2d 81, 93 (Pa. Super. 2007).

Waiver notwithstanding, we find that Appellant's claim of error is meritless. We have explained:

> "Our standard of review for a claim of prosecutorial misconduct is limited to whether the trial court abused its discretion." *Commonwealth v. Solomon,* 25 A.3d 380, 383 (Pa.Super.2011). "In considering this claim, our attention is focused on whether the defendant was deprived of a fair trial, not a perfect one." *Id.* Not every inappropriate remark by a prosecutor constitutes reversible error. *Commonwealth v. Harris,* 884 A.2d 920, 927 (Pa. Super. 2005), *appeal denied,* 593 Pa. 726, 928 A.2d 1289 (2007). A prosecutor's statements to a jury do not occur in a vacuum, and we must view them in context. *Solomon, supra* at 383. Even if the prosecutor's arguments are improper, they generally will not form the basis for a new trial unless the comments unavoidably prejudiced the jury and prevented a true verdict. *Commonwealth v. Rolan,* 964 A.2d 398, 410 (Pa. Super.2008).

***Commonwealth v. Lewis,*** 39 A.3d 341, 352 (Pa. Super. 2012). Applying ***Lewis,*** we do not find that the trial court abused its discretion in overruling Appellant's objections to the Commonwealth's comments and denying a new trial. The Commonwealth's statements to the jury properly commented on, and sought to rebut, Appellant's defense strategy that the victim died from an unrelated stroke due to his preexisting hypertension, rather than from

Appellant's attack of the victim. Accordingly, we find that Appellant is not entitled to relief. ***See Commonwealth v. Washington,*** 927 A.2d 586, 613 (Pa. 2007) (claims of prosecutorial misconduct denied post-conviction relief where prosecutor's "comments were firmly based on the evidence").

In his fifth issue, Appellant asserts that the Commonwealth "failed to disprove the justification of self-defense beyond a reasonable doubt." Appellant's Brief at 46. We disagree. Our crimes code provides in pertinent part:

> **(a)  Use of force justifiable for protection of the person.-**
>
> The use of force upon or toward another person is justifiable when the actor believes that such force is immediately necessary for the purpose of protecting himself against the use of unlawful force by such other person on the present occasion.

18 Pa.C.S.A. § 505(a).

Instantly, Appellant presented evidence to support his defense that he was justified in using force against the victim because the victim had brandished a gun toward Appellant. Appellant called Kimberly McDonald, Amber McDonald's sister. Ms. McDonald testified that she observed Appellant "sitting on the steps" of the Brownsville Apartments, and recognized the victim as he drove by and "had a black gun in his hand." N.T., 10/9/13, at 302-304. Ms. McDonald further testified that she recognized the victim from a single car ride that the victim had given her while the victim was traveling on "[Route] 51." *Id.* at 304. She indicated that she spoke with the victim "for about two hours." *Id.* However, Ms.

McDonald also conceded that Appellant "is the father of [her] two nephews," and acknowledged that she had failed to "tell any of the police officers investigating the case" about the victim brandishing a gun in "the two years" following Appellant's initial arrest, and admitted pleading guilty to theft of services on August 27, 2013, approximately six weeks prior to Appellant's trial. *Id.* at 309-311.

Moreover, the record shows that the jury disagreed with Appellant's contentions that the victim was the aggressor, and that Appellant only used the force necessary to defend himself against the victim. In their deliberations, the jury was free to credit the testimony of various witnesses, including Kimberly McDonald, and Appellant, who testified that he approached the victim's car, kicked the car and the victim, and assaulted the victim during a two-part attack. Therefore, contrary to Appellant's argument, the record reflects that the Commonwealth established sufficient evidence to disprove that Appellant acted in self-defense. ***See Commonwealth v. Truong,*** 36 A.3d 592, 599-560 (Pa. Super. 2012) (self-defense negated where record shows "appellant used more force than necessary to defend himself") (citations omitted). We have explained that "[i]t is the function of the jury to evaluate evidence adduced at trial to reach a determination as to the facts, and where the verdict is based on substantial, if conflicting evidence, it is conclusive on appeal." ***Commonwealth v. Reynolds,*** 835 A.2d 720, 726 (Pa. Super. 2003) (internal citation omitted). We also recognize that "the jury [is] not

obligated to accept" the evidence submitted by the defense. ***Commonwealth v. Boczkowski,*** 846 A.2d 75, 82 (Pa. Super. 2004) ***citing*** ***Commonwealth v. Tharp,*** 830 A.2d 519, 527 (Pa. 2003).

In his sixth issue, Appellant challenges the trial court's instruction to the jury that Appellant "had a duty to retreat." Appellant's Brief at 49. Again, we find waiver. While Appellant cites the applicable statute, he cites no jurisprudence for his position that the attack's location in the parking lot of the Bank Building and on High Street afford him no duty to retreat given its proximity to Appellant's abode. *See* Appellant's Brief at 49-52. The failure to cite authority supporting an argument constitutes waiver. ***Chapman-Rolle v. Rolle***, 893 A.2d 770, 774 (Pa. Super. 2006); Pa.R.A.P. 2119(a).

Waiver notwithstanding, based on our review of the trial court's jury instructions, we discern no error. Appellant requested and received self defense jury instruction over the Commonwealth's objections, and Appellant did not challenge the portion of the jury instructions which referenced the duty to retreat. *See* N.T., 10/9/13, at 371-372; N.T., 10/10/13, at 429-434.

Our crimes code provides:

**(b)   Limitations on justifying necessity for use of force.**

***

(2) The use of deadly force is not justifiable under this section unless the actor believes that such force is necessary to protect himself against death, serious bodily injury …; nor is it justifiable if:

\*\*\*

> (ii) the actor knows that he can avoid the necessity of using such force with complete safety by retreating …[.]

18 Pa.C.S.A. § 505(b)(2)(ii).

Our review of the record and of the statutory guidelines regarding the use of deadly force in self-defense scenarios comports with the trial court's determination that the jury was properly charged regarding Appellant's duty to retreat. "A jury instruction will be upheld if it clearly, adequately, and accurately reflects the law." *Commonwealth v. Smith*, 956 A.2d 1029, 1034-35 (Pa. Super. 2008) (*en banc*) (internal citation omitted). Further, "[w]hen reviewing a challenge to part of a jury instruction, we must review the jury charge as a whole to determine if it is fair and complete. A trial court has wide discretion in phrasing its jury instructions, and can choose its own words as long as the law is clearly, adequately, and accurately presented to the jury for its consideration. The trial court commits an abuse of discretion only when there is an inaccurate statement of the law." *Commonwealth v. Roser*, 914 A.2d 447, 455 (Pa. Super. 2006) (internal citation omitted). An issue would warrant a jury instruction where it was raised at trial and the "evidence adduced at trial would support such a charge." *Commonwealth v. Boczkowski,* 846 A.2d 75, 98 (Pa. Super. 2004) (internal citation omitted).

Here, the record reflects that the jury charge did not contain any inaccurate statements of law, and the evidence adduced at trial "supported a

charge" regarding Appellant's duty to retreat. *Id.* While the victim did approach Appellant following the initial attack, as discussed above, Appellant's statement to law enforcement and his own trial testimony reflect that Appellant was the initial aggressor, did not retreat prior to the altercation or when approached by the victim a second time, but rather resumed his assault. Therefore, Appellant's challenge regarding his duty to retreat is unavailing.

In his seventh issue, Appellant argues that the trial court erred in admitting Appellant's "recorded jail conversation" with his paramour, Amber McDonald. Appellant's Brief at 52. Once again, Appellant's argument is undeveloped because he has failed to cite supporting authority beyond Pa.R.E. 402 and 403. *Chapman-Rolle v. Rolle*, 893 A.2d 770, 774 (Pa. Super. 2006); Pa.R.A.P. 2119(a). Nonetheless, we note that Appellant challenges the admission at trial of the following portion of the taped conversations between Appellant and Amber McDonald[2]:

| [Appellant]: | Amber, you f--k seventy-five year old men, that is why I'm in prison. Are you serious? |
|---|---|
| Amber McDonald: | No, John, that is why I f—kin' get the old mother f---er's [sic], because they can't f—k. |

N.T., 10/8/13, at 285.

_____

[2] Appellant's counsel and the Commonwealth stipulated that the voices were those of Appellant and Amber McDonald. N.T., 10/8/13, at 283-284.

- 25 -

While Appellant's trial counsel objected to the admissibility of this evidence, *see id.* at 241, Appellant's trial counsel did not renew his objection when the trial court ruled that it was admissible. *Id.* at 250. Indeed, Appellant's trial counsel even suggested: "Judge, can we have Detective Casmellio just say that this is what was heard. This is what [Appellant] said, the reason [Appellant is] in prison is because you—etcetera and so forth[?]" *Id.* at 242. Appellant's trial counsel's only question to the trial court was: "how is [Amber McDonald's] conduct and decision [as referenced in the taped conversation] relevant to the homicide?" *Id.* at 253. Appellant's question, even if it were to be deemed a renewed objection, challenged relevancy alone and not any other basis for the admissibility of the evidence. Consequently, there is further support for waiver of this issue. **See Commonwealth v. Adams,** 39 A.3d 310, 319 (Pa. Super. 2012) (claim "arguably waived" where "although [a]ppellant initially objected" to testimony … [a]ppellant failed to renew that objection" when the testimony was subsequently referenced during closing arguments by the Commonwealth).

Waiver notwithstanding, we recognize:

> The standard of review employed when faced with a challenge to the trial court's decision as to whether or not to admit evidence is well settled. Questions concerning the admissibility of evidence lie within the sound discretion of the trial court, and a reviewing court will not reverse the trial court's decision absent a clear abuse of discretion. Abuse of discretion is not merely an error of judgment, but rather where the judgment is manifestly unreasonable or where the law is not

- 26 -

applied or where the record shows that the action is a result of partiality, prejudice, bias or ill will.

***Commonwealth v. Young***, 989 A.2d 920, 924 (Pa. Super. 2010) (internal citations omitted).

The record reflects that the Commonwealth moved to have the evidence admitted for motive. N.T., 10/8/13, at 240; 253. The trial court did not abuse its discretion in admitting the challenged portion of the taped conversation between Appellant and Ms. McDonald because it was relevant and germane to Appellant's rancor, jealousy, and anger toward the victim, which goes to Appellant's motive for attacking the victim. ***See Commonwealth v. Ward,*** 605 A.2d 796, 797 (Pa. 1992) ***citing Commonwealth v. Adkins,*** 364 A.2d 287 (Pa. 1976) ("Although motive is not an essential element of the crime, it is always relevant and admissible."). Based on our review of the record, and in the absence of waiver, we would find no abuse of discretion in the trial court's admission of Appellant's tape recorded conversation with Ms. McDonald. ***Young, supra,*** at 924.

In his eighth issue, Appellant contends that the trial court "erred in sentencing [Appellant] to a separate concurrent sentence for the crime of aggravated assault when aggravated assault is a lesser included offense of third degree murder." Appellant's Brief at 53 (emphasis omitted). We

agree.[3]   Merger implicates the legality of a sentence, and as such our standard of review is *de novo* and our scope of review is plenary. ***Commonwealth v. Jenkins***, 96 A.3d 1055, 1056 (Pa. Super. 2014).  "No crimes shall merge for sentencing purposes unless the crimes arise from a single criminal act and all of the statutory elements of one offense are included in the statutory elements of the other offense." 42 Pa.C.S.A. § 9765.  Stated another way, "[s]entences are appropriate for merger when the same facts support convictions for more than one offense, the elements of the lesser offense are all included within the elements of the greater offense, and the greater offense includes at least one additional element." ***Commonwealth v. Ward***, 856 A.2d 1273, 1276 (Pa. Super. 2004).  However, "[i]f the offenses stem from two different criminal acts, merger analysis is not required." ***Commonwealth v. Shank***, 883 A.2d 658 (Pa. Super. 2005) *quoting* ***Commonwealth v. Gatling***, 570 Pa. 34, 807 A.2d 890 (2002) (plurality).

It is well settled that the crime of aggravated assault is a lesser included offense of third degree murder. ***Commonwealth v. Musselman,*** 396 A.2d 625, 626 (Pa. 1979); ***see also Commonwealth v. Brunson,*** 938 A.2d 1057 (Pa. Super. 2007).  Significantly, in ***Gatling,*** our Supreme Court

_____

[3] The trial court explained that it only imposed the concurrent sentence for aggravated assault in the event that Appellant successfully appealed his conviction for third degree murder.

explained that in order for two convictions to merge: (1) the crimes must be greater and lesser-included offenses; and (2) the crimes charged must be based on the same facts. ***Gatling***, 807 A.2d at 899. Here, Appellant's aggravated assault of the victim, which led to the victim's death and to Appellant's conviction for third degree murder, was part of one single criminal act where the attendant facts support both of Appellant's convictions, such that merger applies. Appellant can only be sentenced for his third degree murder conviction. We therefore vacate Appellant's sentence for aggravated assault.

In his ninth issue, Appellant maintains that the trial court "abused its discretion in sentencing [Appellant] to the maximum allowable sentence for the crimes of third degree murder and aggravated assault."[4] Appellant's Brief at 55. Again, Appellant presents an undeveloped argument devoid of citation to pertinent legal authority and thus invoking waiver. ***Tielsch, supra***; ***Chapman-Rolle v. Rolle, supra***.

We nonetheless recognize the trial court's explanation:

> [T]hird degree murder is a felony of the first degree, with a maximum term of imprisonment of up to forty years. [Appellant's] conviction is a Level 5, and he has a Prior Record Score of 4. The Offense Gravity Score is 14. [Appellant's] past convictions include assault, drug possession, criminal conspiracy and burglary, defiant trespass and more than one DUI. In the

_____

[4] Since we are vacating Appellant's sentence for aggravated assault, we decline to address his challenge to his term of imprisonment for aggravated assault.

> Court's view, these multiple convictions over many years indicate an individual who is not amenable to rehabilitation and who has demonstrated a long-standing and continuing indifference to the law and to the rights of others. The sentence imposed is within the statutory guidelines and was handed down only after due consideration of all allowable factors. The Court did not abuse its discretion in this regard.

Trial Court Opinion, 12/19/13, at 12. Based on our review of the record, we would agree with the trial court, and find that the trial court did not abuse its discretion in sentencing Appellant to the maximum allowable period of imprisonment for third degree murder arising from Appellant's attack on the victim, which culminated in the victim's death. *See Commonwealth v. Ventura,* 975 A.2d 1128, 1135 (Pa. Super. 2009) *citing Commonwealth v. Devers,* 546 A.2d 12, 18-19 (Pa. 1988) (affirming judgment of sentence of 20 to 40 years for third degree murder where the trial court considered defendant's pre-sentence report, the circumstances of the offense, defendant's character, defendant's prior criminal record, age, personal characteristics, and potential for rehabilitation).

Judgment of sentence vacated as to aggravated assault only, and affirmed in all other respects. Jurisdiction relinquished.

Judge Bowes joins the memorandum.

Judge Strassburger concurs in the result.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: <u>12/1/2014</u>