J-A26007-19

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

COMMONWEALTH OF PENNSYLVANIA  :  IN THE SUPERIOR COURT OF
  :  PENNSYLVANIA
  :
v.  :
  :
  :
  :
ORLANDO RICARDO WILLIAMS  :
  :
Appellant  :  No. 880 WDA 2018

Appeal from the Judgment of Sentence December 4, 2017
In the Court of Common Pleas of Allegheny County Criminal Division at
No(s): CP-02-CR-0009866-2016

BEFORE: SHOGAN, J., LAZARUS, J., and OLSON, J.

MEMORANDUM BY SHOGAN, J.:      **FILED NOVEMBER 26, 2019**

Orlando Ricardo Williams ("Appellant") appeals from the judgment of
sentence imposed after a nonjury trial at which he was found guilty of first-
degree murder, endangering the welfare of children ("EWC"), and recklessly
endangering another person ("REAP").[1]  We affirm.

The trial court, sitting as the finder of fact, summarized the trial
evidence as follows:

> [O]n June 20, 2016, [eight–year-old] J.S., was admitted into the
> hospital with fatal injuries.  The day before had been Father's Day
> and the family spent the day at Ohiopyle and visited Grandma at
> Big Bear camp grounds.  J.S. was fine all day, laughing, running,
> playing, and eating pizza.  (Nonjury Trial Transcript of
> November 28, 2017 — December 4, 2017, (hereinafter "TT") at
> 53 - 60).  They left for home between 11:00 p.m. and midnight.
> Aliehsa Lininger, J.S.'s mother (hereinafter "Mother") drove the
> family home and the victim slept on the way home.  [Appellant]

_____

[1] 18 Pa.C.S. §§ 2502(a), 4304(a)(1), and 2705, respectively.

was Mother's boyfriend and had lived with the family since 2011. He was the biological father of the youngest child, Z.P., but not [of] the victim or [Mother's thirteen-year-old son, S.S.].

The family arrived home about 1:30 a.m. J.S. fell asleep at the table after they were home and Mother told him to go to his room, but first take out the garbage. (TT at 64). J.S. was not injured at this point. (TT at 65). As J.S. walked towards the front door with the garbage, [Appellant] punched him in the chest for attempting to take the garbage out the front door rather than the back door. The punch caused J.S.'s head to hit the wall. (TT at 185). Mother testified that [Appellant] would physically discipline the children using a belt, paddle, or other items. (TT at 49, 89). After the punch, J.S. took out the garbage and then went upstairs. J.S. had no trouble walking or going upstairs after the punch and did not seem abnormal, so this punch could not have been the cause of the fatal injuries. (TT at 64 - 66, 187).

Mother and S.S. left shortly after that, around 1:30 a.m., for Mother's nighttime commercial cleaning job. (TT at 62, 92). S.S. went with Mother to help her clean many nights, including that night. (TT at 63, 188). While they were away [Appellant] was left at home to care for J.S. and Z.P., his younger brother. (TT at 191). Mother and S.S. returned from their job between 2:30 a.m. and 3:30 a.m. They had been away from the house between one and two hours. (TT at 66, 191).

Soon after they returned home from work, S.S. went to his room and [found] J.S. sleeping in his bed. (TT at 72, 193). S.S. moved J.S. to the floor, placing a pillow underneath his head. (TT at 193). S.S. noticed that J.S.'s clothes were wet. (TT at 197). He was concerned about J.S.'s unusually loud snoring and went downstairs and told Mother, who did not check on J.S. (TT at 72, 193). S.S. did not see J.S. again because when he returned to his [room] J.S. was gone. [Appellant] had been upstairs with the opportunity to move J.S. from the floor into J.S.'s bed.

It is important to note that J.S.'s clothes were wet when S.S. moved him to the floor. [Appellant] told Detective Anthony Perry as he showed the detective around the house, that he threw water on J.S. to try to wake him up. (TT at 147). He also told this to Detective Daniel Goughnour at the McKeesport hospital. He said that he found J.S. unconscious in his bedroom at approximately 3:30 a.m. and he threw water on J.S. to try to wake

- 2 -

him up. [Appellant] was not in custody when [he] made these statements. (TT at 20 - 22).

A few hours after Mother went to sleep, before 6:00 a.m., [Appellant] came down carrying J.S. and said they had to take him to the hospital. (TT at 74). They took J.S. to McKeesport Hospital and from there J.S. was transferred to Children's Hospital.

Dr. Jennifer Clarke, a pediatrician at the Child Advocacy Center at Children's Hospital, testified about J.S.'s condition. She testified that he was admitted about 6 a.m. in critical condition. She said he "essentially presented as dead." (TT at 255). The victim "had a large subdural hemorrhage with mass effect and herniation which [caused] his fatal injury." (TT at 258). J.S. had a large bleed in his brain. (TT at 256 - 258). Dr. Clarke explained what had happened to J.S.:

> So subdural hemorrhages — basically there are veins inside the head, in the brain. When they get torn or avulsed, they bleed, and that collection is your subdural hemorrhage. When they get large -- when they get very large, that collection, there can be mass effect on the brain. So the skull is basically an enclosed space, so if there's something bleeding in there, there's nowhere for that brain -- the brain gets compressed and eventually needs to go somewhere, and so that somewhere is your neck, and that's what you call herniation, when the brain goes down towards your neck, and that causes death. ([TT at] 259)

The subdural hemorrhage was caused by repetitive significant and severe acceleration-deceleration forces to J.S.'s head. (TT at 275). Multiple forward and backward movements plus impact caused the fatal brain injury. (TT at 277). The repetitive impact was severe enough [to] have avulsed the veins. (TT at 275). Dr. Clarke testified that "There was also bruising to the front part of the brain so again signifying that there was a lot of forces that acted on his brain to be shaken in his skull." (TT at 275). A single impact would not have caused the subdural bleeding. (TT at 277). There were abrasions, bruising and swelling on his forehead and multiple bruises on his neck that were not caused by medical care. J.S. did not have any preexisting medical issues that would explain his brain injury. (TT at 266,

270). Dr. Clarke's diagnosis was that the fatal brain injury was caused by child abuse. (TT at 274).

The injuries to his brain were so severe that he would have become symptomatic immediately afterwards, but not necessarily immediately incapacitated, perhaps losing consciousness, showing lethargy, headaches, or vomiting. (TT at 275-276, 301). He would not have seemed normal after the brain injury occurred.

Dr. Todd Luckasevic, a forensic pathologist [and] Associate Medical Examiner for Allegheny County Medical Examiner's Office testified about the autopsy he performed on J.S. His findings were consistent with Dr. Clark[e]'s conclusions. At the time of the autopsy J.S. weighed 51 pounds and his height was 48 inches (TT at 287). J.S.'s head depicted multiple contusions. There was internal trauma to the head and brain. (TT at 294 — 296). Dr. Todd Luckasevic concluded that J.S. had a large subdural hemorrhage of the brain. (TT at 297). Dr. Luckasevic explained that the bleeding in the brain was caused by:

> the head striking a blunt object or a blunt object striking the head, so in this case, again it's more like a -- a couple mechanisms that could occur would be a forceful push against the wall or a forceful push against the floor where you have a sudden stop. You have impact and a sudden stop, because we need to have a sudden stop to cause tearing of the bridging veins which causes that subdural hemorrhage. So the [skull] stops, but the brain still kind of moves in the cranial cavity, and it breaks those bridging veins which causes the hemorrhage. (TT at 312).

The cause of death was blunt force trauma to the head, a homicide. It was not caused by a single blow. There were injuries to the front, back, and right side of J.S.'s head. (TT at 311). There were two major abrasions on the back of the head which could have resulted in the subdural hemorrhage. The bruising of the right side and frontal forehead definitely contributed to the subdural hemorrhage. (TT at 303).

Trial Court Opinion, 1/22/19, at unnumbered 1–4.

Detective James Fitzgerald and Detective Anthony Perry of the Allegheny County Police Department testified as follows: On June 20, 2017, at approximately 8:30 a.m., Detective Fitzgerald was informed by his supervisor that a child was admitted to the hospital with a head injury and was in grave condition. N.T. Trial, 11/28/17, at 24. While Detective Fitzgerald was speaking to Mother, Appellant consented to a search of his vehicle and the house. *Id.* at 27. During the vehicle search, Detective Fitzgerald discovered a plastic bag holding the clothes that J.S. wore to the hospital and noted that the clothes "were wet or moist." *Id.* at 28. Although he later changed his story, Appellant initially admitted to Detective Perry that Appellant attempted to wake J.S. by throwing water on him. N.T. Trial, 11/29/17, at 147.

Detective Fitzgerald also conducted a search of Mother's and Appellant's house. In J.S.'s bedroom, the detective observed red-brown stains on a sheet that was "consistent with blood" and a red-brown stain on the wall of the bedroom. N.T. Trial, 11/28/17, at 35–36. Subsequent testing revealed that the blood stains collected from the bedroom matched J.S.'s DNA. N.T. Trial, 11/29/17, at 242.

At the conclusion of the bench trial on December 4, 2017, the trial court found Appellant guilty of the aforementioned crimes. N.T. Trial, 12/4/17, at 340. The trial court sentenced Appellant on the same day to life in prison without parole on the murder conviction, with no further penalty on the EWC

and REAP convictions. *Id.* Appellant filed post-sentence motions, which the trial court denied. This timely appeal followed. Appellant and the trial court complied with Pa.R.A.P. 1925.

On appeal, Appellant presents the following questions for our consideration:

1.   To convict [Appellant] of First-degree murder, the Commonwealth was required to establish that [Appellant] killed [J.S.]. It failed to do so. Was the evidence insufficient to support [Appellant's] conviction?

2.   To convict [Appellant] of First-degree murder, the Commonwealth was required to establish that [Appellant] had the specific intent to kill. It failed to do so. Was the evidence insufficient to support this conviction?

3.   To convict [Appellant] of Endangering [the] welfare of children (F3), the Commonwealth was required to prove that [Appellant] engaged in a course of conduct of endangering the welfare of [J.S.]. It failed to prove a course of conduct. Was the evidence insufficient to support this conviction?

4.   To convict [Appellant] of Recklessly endangering another person, the Commonwealth was required to prove that [Appellant] engaged in conduct that placed or may have placed J.S. in danger of death or serious bodily injury. Again, it failed to do so. Was the evidence also insufficient to support this conviction?

Appellant's Brief at 2–3.[2]

_____

[2] Appellant raised five more issues in his Rule 1925(b) statement of errors, but he has abandoned them on appeal. *Commonwealth v. Dunphy*, 20 A.3d 1215, 1218 (Pa. Super. 2011) (issues raised in 1925(b) statement that are not included in appellate brief are waived).

All of Appellant's issues challenge the sufficiency of the Commonwealth's evidence to sustain the convictions. Because a determination of evidentiary sufficiency presents a question of law,

> our standard of review is *de novo* and our scope of review is plenary. In reviewing the sufficiency of the evidence, we must determine whether the evidence admitted at trial and all reasonable inferences drawn therefrom, viewed in the light most favorable to the Commonwealth as verdict winner, were sufficient to prove every element of the offense beyond a reasonable doubt. The facts and circumstances established by the Commonwealth need not preclude every possibility of innocence. It is within the province of the fact-finder to determine the weight to be accorded to each witness's testimony and to believe all, part, or none of the evidence. The Commonwealth may sustain its burden of proving every element of the crime by means of wholly circumstantial evidence. Moreover, as an appellate court, we may not re-weigh the evidence and substitute our judgment for that of the fact-finder.

*Commonwealth v. Baker*, 201 A.3d 791, 795 (Pa. Super. 2018) (internal citations, quotation marks, and brackets omitted).

This was a nonjury trial; therefore, the trial court served as the factfinder. "[T]he finder of fact, while passing upon the credibility of witnesses and the weight of the evidence produced is free to believe all, part or none of the evidence." *Commonwealth v. Davison*, 177 A.3d 955, 957 (Pa. Super. 2018) (citation omitted).

Appellant initially challenges whether the Commonwealth offered sufficient evidence to prove two of the elements necessary to sustain his first-degree murder conviction: namely, that he was responsible for the killing and

whether he acted with specific intent to kill. A person commits first-degree murder:

> when he intentionally kills another human being; an intentional killing is defined as a "willful, deliberate and premeditated killing." 18 Pa.C.S. §§ 2501, 2502(a), (d). To sustain a conviction for first-degree murder, the Commonwealth must prove that: (1) a human being was unlawfully killed; (2) the accused was responsible for the killing; and (3) the accused acted with malice and a specific intent to kill. A jury may infer the intent to kill based on the accused's use of a deadly weapon on a vital part of the victim's body.

*Baker*, 201 A.3d at 795–796 (some internal citations and quotation marks omitted).

Appellant first discusses the *actus reus* element of first-degree murder and asserts that the evidence did not identify him as the person who caused J.S.'s death. Appellant's Brief at 14–15. The focus of Appellant's argument is on the timing of J.S.'s injury. Appellant's Brief at 17–24. According to Appellant, evidence of the injury occurring around 3:00 a.m. was "inherently contradictory." *Id.* at 20. Appellant posits that the injury actually occurred around 6:00 a.m., at which time Mother and S.S. were also present in the house, and suggests that one of them could have inflicted the injury. *Id.* at 22. Appellant contends that the Commonwealth's evidence identifying him as the murderer "merely raised a conjectural suspicion which was in and of itself insufficient to convict." *Id.* at 23 (internal quotation and citation omitted).

Rejecting Appellant's argument, the trial court based its ruling on the following:

The evidence . . . showed that [Appellant] was the person responsible for the killing. J.S. was in [Appellant's] exclusive care when the fatal brain injuries occurred. Although the timeline is not precise regarding the time Mother and S.S. left for work and when they returned, it is certain that [Appellant] remained home [with] J.S. and the younger child Z.P. for at least an hour. This [c]ourt found Mother and S.S. to be credible when they testified that Mother took S.S. to work with her. This [c]ourt accepted Mother's explanation that she had originally told the detectives that S.S. stayed at the house while she went to work that night because it was embarrassing to admit that she took S.S. to work with her. (TT at 63). This [c]ourt, as fact-finder, observed Mother at trial as she explained the reasons for her prior inconsistent statement, and determined which of the two statements told by the Mother was worthy of belief. **Commonwealth v. Brown**, 617 Pa. 107, 156, 52 A.3d 1139, 1169 (Pa. 2012). Credibility determinations are made solely by the fact-finder, and will not be overturned by the appellate courts. This [c]ourt, as fact-finder, was able to exclusively weigh the evidence, assess witness credibility, and was free to believe all, part, or none of the witness's testimony. **Commonwealth v. Konias**, 136 A.3d 1014, 1023 (Pa. Super. 2016).

The evidence proved that J.S. was in [Appellant's] sole care during the time period that the brain injury must have occurred. J.S. had not received the fatal injuries before Mother and S.S. left the house for work, as they both saw him walking upstairs uninjured shortly before they left. The punch in J.S.'s chest that S.S. witnessed, which caused J.S.'s head to hit a wall, could not have caused the fatal brain injury. Both Dr. Clark[e] and Dr. Luckasevic said that a single blow to the head would not have caused the subdural hemorrhage that caused J.S.'s death. Additionally, J.S. continued to take out the garbage and then walked upstairs, which would have been impossible after the subdural hemorrhage occurred. Mother and S.S. would have noticed if the subdural hemorrhage occurred before they left the house.

It is also clear from the evidence that the fatal brain injury occurred before Mother and S.S. returned from work. Shortly after arriving home, S.S. went upstairs to his room and J.S. was in the bed where S.S. usually slept. When S.S. moved J.S. to the floor, he noticed that J.S's clothes were wet and J.S.'s snoring was unusually loud. [Appellant] admitted to Detective Perry and

Detective Goughnour that he poured water on J.S. attempting to wake him. This must have occurred before Mother and S.S. returned home since J.S. was wet when S.S. moved him. This time-line established that [Appellant] caused the fatal brain injury because it occurred when Mother and S.S. were at work and J.S. was in [Appellant's] exclusive care.

Trial Court Opinion, 1/22/19, at unnumbered 5–6.

In support of his position that the evidence was insufficient to establish that he committed the murder, Appellant relies on **Commonwealth v. Woong Knee New**, 47 A.2d 450 (Pa. 1946). The conviction in **New** was based on evidence that placed the defendant with the victim at the victim's home shortly before he was murdered. There was, however, no evidence tending to prove that the defendant committed the crime or casting doubt on the equally likely possibility that an unknown assailant killed the victim after the defendant left his company. **Id.** at 468. In reversing the conviction the Pennsylvania Supreme Court noted that:

When two equally reasonable and mutually inconsistent inferences can be drawn from the same set of circumstances, a [fact-finder] must not be permitted to guess which inference it will adopt, especially when one of the two guesses may result in depriving a defendant of his life or his liberty.

**Id.**

In contrast, the nonjury trial we are reviewing involved fatal blunt force trauma to the head and a parental figure who never left the scene of the crime. The Commonwealth established that J.S. was not seriously injured when Mother and S.S. left the house. Although S.S. witnessed Appellant punch J.S. in the chest, causing J.S. to hit the back of his head against a wall,

- 10 -

*see* N.T. Trial, 11/29/17, at 185–186, Mother testified that when she left the house, there was nothing wrong with J.S. N.T. Trial, 11/28/17, at 65. S.S. also recalled that after Appellant punched J.S., J.S. was able to walk up the stairs without difficulty. N.T. Trial, 11/29/17, at 187. This evidence indicates that the initial punch and resultant head bang were only the precursors to the subsequent blunt force trauma inflicted on J.S. that night.

This conclusion is supported by Dr. Clarke's medical opinion that an individual with the type of brain injury that J.S. ultimately suffered would not have been able to walk up steps. N.T. Trial, 11/29/17, at 278. Furthermore, Dr. Clarke asserted that J.S.'s subdural bleeding could not have been caused by a single impact; rather, it resulted from "repetitive acceleration-deceleration forces upon the head." *Id.* at 277. Dr. Luckasevic confirmed that J.S.'s external injuries to the forehead contributed to the subdural hemorrhage. N.T. Trial, 11/30/17, at 303. It is obvious that a punch to the chest and hitting the back of a head on a wall would not cause an external injury to the forehead.

We next examine the events that transpired after Mother and S.S. returned home. When Mother walked into the house, she proceeded to the second-floor bathroom. Mother passed by J.S.'s and Z.P.'s bedroom on her way to the bathroom, but she did not look into their room. N.T. Trial, 11/28/17, at 68–69. She did, however, open the door to S.S.'s bedroom and, from the hallway, observed J.S. sleeping in S.S.'s bed and heard him snoring

loudly. *Id.* at 69. That was the last time she saw J.S. until Appellant woke her in the morning. *Id.* at 73.

S.S. testified that when he returned home, he went upstairs to go to sleep. N.T. Trial, 11/28/17, at 192. When he entered his bedroom, he saw J.S. sleeping in S.S.'s bed and heard him snoring loudly. N.T. Trial, 11/28/17, at 192. When S.S. moved J.S. to the floor, he noticed that J.S.'s clothing was wet. *Id.* at 193, 197. S.S. went downstairs and told Mother that S.S. was sleeping in his room. *Id.* at 194. S.S. then asked Appellant if he knew why J.S. was sleeping in his bed. *Id.* at 195. Appellant responded that J.S. was supposed to be cleaning his room. *Id.* After another trip down and up the stairs, S.S. encountered Appellant walking down the steps from the upstairs. *Id.* at 196. When S.S. then entered his bedroom, he noticed that J.S. was back in his own bedroom. *Id.* at 197. At approximately 6:00 a.m., Appellant came downstairs carrying J.S. and told Mother that J.S. needed to go to the hospital. *Id.* at 74. According to the hospital records examined by Dr. Clarke after J.S. was transferred to Children's Hospital, J.S. presented at UPMC-McKeesport with fixed and dilated pupils, a bruised forehead, no discernable gag reflex, and a low ph level. N.T. Trial, 11/29/17, at 255. According to Dr. Clarke, when J.S. arrived at UPMC-McKeesport "[h]e essentially presented as dead." *Id.*

This timeline establishes that, unlike the factual scenario presented in *New*, there were not two equally reasonable inferences to be drawn from the

evidence. In **New**, the defense presented testimony from alibi witnesses and from the defendant designed to prove that the defendant did not kill the victim. **New**, 47 A.2d at 453, 461–462. In the instant matter, there was no evidence presented that either Mother or S.S. inflicted J.S.'s fatal injuries. Other than looking in on J.S. from the hallway, nothing in the record indicates that Mother had any contact with J.S. after she came home from her cleaning job. S.S.'s contact with J.S. was his observation of J.S. in his bedroom, hearing J.S.'s snoring, relocating J.S. to the floor, and reporting the situation to Mother and Appellant. These facts, in contrast to those surrounding Appellant's activity during the time in question, do not support an equal and reasonable inference that Mother or S.S. killed J.S. Thus, we consider the factual posture of **New** distinguishable from the case at hand.

To conclude, our review of the evidence supports the trial court's findings with regard to Appellant's involvement in J.S.'s death. While we agree with Appellant that there is no direct evidence of what transpired between J.S. and Appellant when J.S. was in Appellant's exclusive care, the circumstantial evidence established that Appellant caused J.S.'s fatal injuries. Despite defense counsel's forceful effort to undermine the Commonwealth's case, as the factfinder, the trial court was free to believe the Commonwealth's theory and evaluate the evidence in a manner supporting its decision that Appellant was the only person who could have injured J.S. Viewing the trial evidence and all reasonable inferences drawn therefrom in the light most favorable to

the Commonwealth as verdict winner, we agree with the trial court that the evidence was sufficient to prove beyond a reasonable doubt that Appellant was the perpetrator of these crimes.[3]

Appellant's second issue challenges the *mens rea* element of first-degree murder; specifically, Appellant contends that the Commonwealth failed to prove he had the requisite intent to kill the victim. Appellant's Brief at 24. "A criminal homicide constitutes murder of the first degree when it is committed by an intentional killing." 18 Pa.C.S. § 2502(a). An intentional killing is "by means of poison, or by lying in wait, or by any other kind of willful, deliberate and premeditated killing." 18 Pa.C.S. § 2502(d). "It is well-established that to convict a defendant of first-degree murder, the Commonwealth must show that the defendant killed another person with the specific intent to kill that person and malice aforethought." ***Commonwealth v. Perez***, ___ A.3d ___, 2019 PA Super 300, *6 (Pa. Super. filed October 7, 2019) (quoting ***Commonwealth v. Santos***, 876 A.2d 360, 363 (Pa. 2005)).

_____

[3] To the extent Appellant is challenging the weight of the evidence, the issue is waived for failure to include it in his Rule 1925(b) statement. ***Commonwealth v. Lord***, 719 A.2d 306, 309 (Pa. 1998) ("Any issues not raised in 1925(b) statement will be deemed waived."). Additionally, even if certain language in Appellant's 1925(b) statement might imply that he is advancing a weight-of-the-evidence claim, we will not review it because Appellant did not develop this argument in his appellate brief. ***Commonwealth v. Charleston***, 94 A.3d 1012, 1022 (Pa. Super. 2014) (issue waived when the appellant failed to develop argument on appeal). ***See also Dunphy***, 20 A.3d at 1218 (issues raised in 1925(b) statement that are not included in appellate brief are waived).

"Specific intent to kill can be established through circumstantial evidence, such as the use of a deadly weapon on a vital part of the victim's body." *Id.* (quoting *Commonwealth v. Mattison*, 82 A.3d 386, 392 (Pa. 2013)). "Specific intent to kill can be proven where the defendant knowingly applies deadly force to the person of another." *Commonwealth v. Haney*, 131 A.3d 24, 36 (Pa. 2015) (quotations and citation omitted). Specific intent to kill can be discerned from the conduct and attending circumstances, showing the perpetrator's state of mind. *Commonwealth v. Gonzalez*, 858 A.2d 1219, 1223 (Pa. Super. 2004).

Appellant recognizes that first-degree murder is an intentional killing. Appellant's Brief at 24. Focusing on the "willful, deliberate and premeditated" category of intentional killings, Appellant claims the evidence failed to prove that he "consciously considered beforehand" or "plotted in advance" to kill the victim. *Id.* at 29. Appellant points to the lack of direct evidence of Appellant's intent to fatally injure J.S.: "[W]e truly don't know how J.S. was injured." *Id.* at 30. He also dismisses as "nebulous" the evidence surrounding the circumstances of J.S.'s death: "[It] failed to show that [Appellant] **knowingly** used deadly force." *Id.* (emphasis in original).

The trial court disagreed, citing the expert medical opinions of Dr. Clarke, that "[m]ultiple forward and backward movements plus impact caused the fatal brain injury," Trial Court Opinion, 1/22/19, at unnumbered 3,

- 15 -

and of Dr. Luckasevic that a single blow to the head would not have caused the subdural hemorrhage that caused J.S.'s death. *Id.* at unnumbered 4.

Based on this evidence, the trial court concluded, "[T]he use of deadly force on the helpless young victim [Appellant] was entrusted to protect showed specific intent to kill, even though there was no evidence showing with particularity how the beatings were carried out." Trial Court Opinion, 1/22/19, at unnumbered 7 (citing *Commonwealth v. Woodward*, 129 A.3d 480, 491 (Pa. 2015)). In response to Appellant's claim that the verdict was based on speculation and facts not of record, the trial court opined: "[A]lthough there was no testimony to show exactly how the beating was carried out, this court did not speculate by concluding that [Appellant] banged the victim's head on a flat surface, not once but multiple times." Trial Court Opinion, 1/22/19, at unnumbered 7. Again, the trial court relied on the expert medical testimony as to the cause of the victim's injuries. *Id.*

The trial court also considered Appellant's post-injury actions as indicative that he acted with the specific intent to kill. The trial court observed, knowing that J.S. was nonresponsive, Appellant threw water on J.S. to rouse him. Despite causing grave injury to the victim, Appellant did not seek medical attention immediately. Rather, he waited several hours before waking Mother and taking J.S. to the hospital. According to the trial court, Appellant's "refusal to seek timely medical attention satisfied the specific intent to kill

element of first-degree murder." Trial Court Opinion, 1/22/19, at unnumbered 6.

Appellant relies heavily on our decision in **Commonwealth v. Predmore**, 199 A.3d 925 (Pa. Super. 2018) (*en banc*), to challenge the trial court's specific-intent-to-kill determination. In **Predmore**, the victim confronted the defendant at the victim's ex-girlfriend's house. After a fight between the men, the defendant retrieved a gun from his car and pointed it at the victim's chest. When the victim turned and ran away, the defendant fired three shots—two of which hit the victim in the back of his calves. **Id.** at 927. When the defendant was charged with various offenses, he filed a *habeus corpus* motion to dismiss the attempted murder charge, and the trial court ruled that "the Commonwealth failed to present *prima facie* evidence of [the defendant's] specific intent to kill the victim." **Id.**

On review, we observed that the "'use of a deadly weapon directed at a vital organ of another human justifies a factual presumption that the actor intended death unless the testimony contains additional evidence that would demonstrate a contrary intent.'" **Predmore**, 199 A.3d at 931 (quoting **Commonwealth v. Alston**, 317 A.2d 229, 231 (Pa. 1974)). **See also Commonwealth v. Knox**, ___ A.3d ___, 2019 PA Super 278, *5 (Pa. Super. filed September 12, 2019) (citation omitted) (factfinder may infer malice "from the use of a deadly weapon upon a vital part of the victim's body."). We then determined that the presumption did not apply in **Predmore** because

- 17 -

the defendant did not shoot the victim in a vital organ, and in the absence of that presumption, the Commonwealth was required to demonstrate other evidence of a specific intent to kill. ***Predmore***, 199 A.3d at 931–932 (citation omitted).

Appellant urges that ***Predmore*** precludes a conclusion that Appellant had the specific intent to kill J.S. because the evidence did not show (1) that a deadly weapon was applied to a vital organ, or (2) that Appellant verbally indicated that he intended to kill J.S. Appellant's Brief at 33. Neither position has merit.

First, although Appellant does not explain whether he is refuting the use of a deadly weapon or denying that a vital organ was involved, he would be mistaken in either instance. A victim's head is "a vital part of the body." ***Commonwealth v. Chine***, 40 A.3d 1239, 1242 (Pa. Super. 2012).

Regarding the deadly weapon element, although the Pennsylvania Supreme Court noted in ***Commonwealth v. Thomas***, 594 A.2d 300 (Pa. 1991), that malice is not ordinarily evident when a homicide results from a beating without weapons, the Court further explained that "the presence of malice is a question to be determined by examining all the circumstances of the assault." ***Id.*** at 302. The Court then described three instances wherein beatings without weapons supported a finding of malice. ***See Commonwealth v. Moore***, 412 A.2d 549, 551 (Pa. 1980) (quotation and citation omitted) ("size of assailant, manner in which fists were used, the

- 18 -

ferocity of the attack and its duration and provocation" were circumstances supporting a malice finding); ***Commonwealth v. Buzard***, 76 A.2d 394, 396 (Pa. 1950) (malice disclosed where the defendant was taller and heavier than the victim, he forced the victim to the ground and beat him repeatedly on both sides of the face and head); and ***Commonwealth v. Dorazio***, 74 A.2d 125, 126–127 (Pa. 1950) (former professional prize fighter stood over the victim and struck him repeatedly thereby causing a massive brain hemorrhage). ***Thomas***, 594 A.2d at 302.

At the time of the instant offense, Appellant was thirty-eight years old and weighed 170 pounds; J.S. was eight years old and weighed fifty-one pounds. Criminal Complaint, 8/9/16, Trial Court Docket Entry 2; N.T. Trial, 11/27/17, at 43; N.T. Trial, 11/30/17, at 302. The medical evidence established "a single impact would not have caused the [brain injury. Rather, it was caused by] multiple forward and backward movements plus impact." N.T. Trial, 11/29/17, at 277. As in ***Moore, Buzard, and Dorazio***, the circumstances surrounding J.S.'s killing support a malice finding. Appellant directed a deadly weapon, repeated use of his hands, on a much younger, smaller victim, at J.S.'s head. Accordingly, the presumption of malice applies in this matter unless additional evidence demonstrates a contrary intent. ***Predmore***, 199 A.3d at 931.

Appellant asserts that his "complete lack of any verbal expression of intent to kill . . . weighs against a finding that the evidence reasonably

supported an inference of intent to kill." Appellant's Brief at 33. This argument is specious. While Appellant cites **Predmore** to support his claim that absent his verbal indication that he intended to kill J.S., a finding of malice is unwarranted, the **Predmore** Court discussed such verbalization in the context of whether, in the absence of the presumption of malice, such an articulation, or lack thereof, was relevant to finding a specific intent to kill. **Predmore**, 199 A.3d at 932. Here, where the presumption of malice does apply, this evidence hardly suggests a contrary intent.

Nor does the decision in **In the Interest of J.B.**, 189 A.3d 390 (Pa. 2018), advance Appellant's argument that the evidence was insufficient to prove the *mens rea* element for first degree murder. In **J.B.**, the Pennsylvania Supreme Court analyzed the sufficiency of the Commonwealth's evidence supporting the conviction of an eleven-year-old boy for murdering his stepmother. The Court concluded:

> all of the Commonwealth's forensic and eyewitness testimony, and all reasonable inferences derived therefrom, viewed in a light most favorable to it, was, at best, in equipoise, as it was equally consistent with two possibilities: first, that a person or persons unknown entered the house in which J.B.'s stepmother was sleeping and shot her to death . . .; second . . . J.B. . . . shot the victim in the back of the head. . . . The Commonwealth's evidence was, therefore, insufficient as a matter of law to overcome Appellant's presumption of innocence, and the juvenile court's adjudication of his delinquency for these serious crimes must be reversed.

**J.B.**, 189 A.3d at 421–422.

Relying upon the "equipoise doctrine," Appellant offers, "[A]ssum[ing] the worst—that as a result of [Appellant's] actions, J.S. hit his head off the

wall and floor more than once—then one reasonable inference" is that Appellant struck the victim "**with the intent to cause bodily injury** rather than with a premedi[t]ated intent to kill . . . ." Appellant's Brief at 38 (emphasis in original). Appellant thus urges that the evidence equally supports an inference that he did not possess the *mens rea* necessary to validate a first-degree murder conviction.

We have previously discussed the sufficiency of the evidence demonstrating the requisite malice for Appellant's murder conviction. We credit that same evidence to reject Appellant's reliance on the equipoise doctrine.

Finally, Appellant attempts to distinguish this matter from other child-abuse cases wherein the first degree murder convictions were premised on particularly gruesome acts. *See e.g., Commonwealth v. Tharp*, 830 A.2d 519 (Pa. 2003) (child restrained, starved to death, and body disposed of in trash bags placed at roadside); *Commonwealth v. Powell*, 956 A.2d 406 (Pa. 2008) (beatings so severe as to alter appearance of child's face, extensive physical injuries inflicted on the child, and failure to timely seek medical assistance); and, *Commonwealth v. Chambers*, 980 A.2d 35 (Pa. 2009) (child beaten with an extension cord, thrown across the room, and slowly suffocated). Citing extreme examples of ongoing abuse does not diminish or excuse Appellant's actions and in no way downgrades the suffering J.S. endured.

In summation, we find support in the record for the trial court's findings regarding Appellant's specific intent to kill. In doing so, we strenuously reject Appellant's assertion that "this case is a far cry away from a situation where a defendant knowingly used deadly force, such as when he strangles the life out of his victim." Appellant's Brief at 30 (emphasis omitted). The medical evidence established that Appellant inflicted blunt force trauma to J.S.'s head, a vital organ, by striking it against a hard flat surface multiple times. Appellant then waited several hours to seek medical attention for the victim. Viewing the evidence and reasonable inferences drawn therefrom in the light most favorable to the Commonwealth, we discern no error in the trial court's conclusion that the evidence was sufficient to prove beyond a reasonable doubt that Appellant acted with the specific intent to kill.

Appellant combines his third and fourth issues, assailing the Commonwealth's *actus-reus* evidence as insufficient to support the EWC and REAP convictions. Appellant's Brief at 48. According to Appellant, because the Commonwealth failed to prove that he "inflicted J.S.'s injuries[, i]t thus likewise failed to show that [Appellant] recklessly engaged in conduct which places or may place another person in danger of death or serious bodily injury" and "engaged in a course of conduct of endangering the welfare of a child." *Id.* (quoting 18 Pa.C.S. §§ 2705 and 4304(b)(1)(ii)).

"A parent, guardian or other person supervising the welfare of a child under 18 years of age, or a person that employs or supervises such a person,

commits an offense if he knowingly endangers the welfare of the child by violating a duty of care, protection or support." 18 Pa.C.S. § 4304(a)(1). If the actor engaged in a course of conduct of endangering the welfare of a child or created a substantial risk of death or serious bodily injury, the offense constitutes a felony of the third degree. *Id.* at (b)(1)(ii), (iii). As noted, J.S. was under Appellant's care while Mother was at work.

"A person commits a misdemeanor of the second degree if he recklessly engages in conduct which places or may place another person in danger of death or serious bodily injury." 18 Pa.C.S. § 2705. The degree of culpability required is recklessness, defined in 18 Pa.C.S. § 302, as follows:

(b) Kinds of culpability defined.—

\* \* \*

(3) A person acts recklessly with respect to a material element of an offense when he consciously disregards a substantial and unjustifiable risk that the material element exists or will result from his conduct. The risk must be of such a nature and degree that, considering the nature and intent of the actor's conduct and the circumstances known to him, its disregard involves a gross deviation from the standard of conduct that a reasonable person would observe in the actor's situation.

18 Pa.C.S § 302(b)(3). "Recklessly endangering another person is a crime 'directed against reckless conduct entailing a serious risk to life or limb out of proportion to any utility the conduct might have.'" *Commonwealth v. Vogelsong*, 90 A.3d 717, 719 (Pa. Super. 2014) (citing *Commonwealth v. Rivera*, 503 A.2d 11 (Pa. Super. 1985) (*en banc*)). Thus, to support a REAP conviction, the evidence must establish that the defendant acted recklessly in

a manner that endangered another person.  18 Pa.C.S. § 2705.  A person acts in a reckless manner when he consciously disregards a substantial and unjustifiable risk.  18 Pa.C.S. § 302(b)(3).

Disposing of Appellant's EWC argument, the trial court observed that the term "course of conduct" is used "to differentiate the penalties for single and multiple endangering acts."  Trial Court Opinion, 1/22/19, at unnumbered 8 (citing **Commonwealth v. Kelly**, 102 A.3d 1025, 1031 (Pa. Super. 2014)). According to the trial court, the evidence demonstrated that Appellant "knowingly endangered the victim's welfare and violated the duty of care and protection" by punching J.S. in the chest and later hitting J.S.'s head multiple times.  Trial Court Opinion, 1/22/19, at unnumbered 8.  The trial court also rejected Appellant's REAP argument:  "This claim has already been refuted. The evidence proved that [Appellant] caused fatal injuries to J.S. and then failed to seek medical assistance until hours later."  **Id.**

Again, our scrutiny of the record reveals support for the trial court's findings.  Given our standard of review, we agree with the trial court that the EWC and REAP evidence was sufficient to prove beyond a reasonable doubt that Appellant engaged in a course of conduct that recklessly—and fatally— endangered the child victim.

Judgment of sentence affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date:   11/26/2019